Nashville, C. & St. L. Ry. Co. *v.* Jackson.

(*Jackson*, April Term, 1948.)

Opinion filed June 12, 1948.

Rehearing denied July 17, 1948.

Wм. F. Murrah, of Memphis, and Walton Whitwell, of Nashville, for plaintiff in error.

W. C. Rodgers, of Memphis, and John D. Green, of Starkville, Miss., for defendant in error.

Mr. Justice Tomlinson delivered the opinion of the Court.

A passenger train of the Nashville, Chattanooga & St. Louis Railway Company collided on April 2, 1943 with another of its trains at Bruceton. L. F. Jackson, who

was a passenger on the Nashville bound train, instituted this suit for personal injuries alleged to have been received in this collision. The railroad assumed liability for any injuries proximately resulting therefrom, but has consistently taken the position in this case that there is no causal connection between the injuries or afflictions with which Jackson claimed to be suffering and the collision. The Court of Appeals affirmed the judgment of the Circuit Court for $2,750 based on the jury's verdict. The railroad files this petition for *certiorari*.

Jackson suffered from what he says is a hernia and an affliction of the penis called peyronie's disease, described by the doctors as being "similar to a callus under the skin". The opinion is expressed by some of these doctors that the latter ailment could have been caused by a lick.

It is the insistence of the railroad that all the pain and suffering, if any, of Jackson and his loss of time came from these two ailments and, pursuant to its position that there is no evidence of a causal connection between these alleged afflictions and the collision, assigns as error the action of the Court of Appeals in not sustaining its assignment of error directed to the proposition that the trial court erred in failing to direct a verdict for the defendant, as requested, because, so the railroad alleges, there is no competent evidence that the injuries for which damages are sought were the result of the collision. An assignment of error going to the same point asserts as error the refusal of the trial court to instruct the jury that no award of damages may be made on acount of the alleged hernia or penis trouble "because there is no evidence upon which such an award of damages can be based".

The Court of Appeals, in considering the railroad's insistences above stated, quoted from *Adams* v. *Manhattan Life Ins. Co.*, 24 Tenn. App. 171, 141 S. W. (2d) 930, wherein it is held that in cases involving a hidden disease with respect to which a layman could have no knowledge the Court must depend upon expert testimony; and, in such case, in the absence of such evidence to establish causal connection, it is improper to submit the issue to the jury. In connection with what the Court of Appeals conceived to be the applicable rule as stated in the above mentioned case, it held that it had looked in vain through the record for evidence of a substantial nature connecting this alleged hernia and penis injury with the collision. So it is that the Court of Appeals held the law to be that in this case it could look only to expert testimony as to whether the alleged hernia and penis injury are the direct consequence of the collision and that there is no expert testimony connecting the afflictions stated with the collision; that, therefore, the trial court erred in failing to instruct the jury that no recovery could be had for these two afflictions.

However, the Court of Appeals further held that after excluding evidence of the two alleged injuries above stated "we find ample evidence of excruciating physical pain and suffering, and mental anguish, and loss of wages, as hereinabove outlined, the aggregate amount of the actual pecuniary damages suffered being far in excess of the amount of the verdict and judgment of $2750.00. The actual loss of wages for the first year suffered by plaintiff was in excess of $4,000.00, to say nothing of the pecuniary loss sustained during the other years prior to this trial."

Thereupon, the Court of Appeals applied code section 10654, upon the theory that it did not affirmatively appear that the railroad was prejudiced by the failure of the trial judge to instruct the jury that no recovery could be had by reason of the hernia or injury to the penis.

In its petition for *certiorari* the railroad insists that there is no evidence of any pain, suffering or loss of wages, other than that which came from the alleged hernia and alleged penis injury and, therefore, the Court of Appeals was in error in holding that it was not prejudiced by the erroneous failure of the trial judge to give the jury instruction in question.

There was expert testimony in this record that the hernia affliction could be remedied by a minor operation. There was other such evidence that this was a major operation. By reason of this testimony, the trial judge instructed the jury that if the alleged hernia could have been remedied by an operation to which a person acting with ordinary care would have submitted, then any damages which resulted from a neglect or failure to submit to such an operation could not be awarded Jackson. The jury, after considering its verdict for a while, returned into Court and inquired as to whether that instruction meant that Jackson could not recover at all. After receiving a negative reply and after having further considered as to its verdict, the jury again returned into Court and requested the judge to again read to it this special instruction as to mitigation of damages. The instruction was again read and thereafter the jury returned into Court with the verdict stated.

Thus, it is made manifest that the jury in awarding its verdict did take into consideration the hernia. Therefore, if the trial court was in error, as the Court of Ap-

peals has held, in failing to give specific instructions that no recovery could be had on account of the hernia, it was prejudicial error and entitled the railroad to a reversal. *Nashville & C. Railroad Co.* v. *McDaniel*, 80 Tenn. 386, 389, 390.

The result just stated would follow since Jackson, or rather his administrator (Jackson having died since this trial) has filed no petition for *certiorari* or assigned error to the finding of fact of the Court of Appeals that there is no competent evidence of a causal connection between the hernia and the collision, *Kenner* v. *City Nat. Bank*, 164 Tenn. 119, 124, 46 S. W. (2d) 46; *Lloyds America* v. *Duck*, 174 Tenn. 520, 522, 128 S. W. (2d) 625, unless the Court of Appeals erred, as a matter of law, in holding that only expert evidence under the facts of this case could be looked to in ascertaining whether there is any substantial evidence of a causal connection between the hernia and the collision. In the latter event, if the Court of Appeals made a mistake of law but reached the right conclusion upon an erroneous view, its conclusions will be upheld based upon the correct rule of applicable law, notwithstanding respondent's failure to file petition for *certiorari* or assign error. *Sheafer* v. *Mitchell*, 109 Tenn. 181, 193, 71 S. W. 86.

So, this suit is reduced to a consideration of the question as to whether the Court of Appeals committed error, as a matter of law, under the evidence in this case in holding that only expert evidence could be examined in ascertaining whether there was any substantial evidence of a causal connection between the hernia and the collision. Consideration of that question necessitates some review of the evidence.

Mr. Jackson was approximately fifty-seven years of age at the time of this collision. His testimony, which is uncontradicted upon this point, is that up to the moment of the collision he had enjoyed splendid health and had not experienced any of the aches and pains which commenced immediately after the collision and continued to the time he testified in this case. He is very strongly corroborated in this testimony by witness Carpenter, an acquaintance of long standing and a close business associate. Carpenter testifies that at the time he went into the army in March of 1943 before the collision in April 1943 he was with Jackson a great deal, since they worked for the same company, and that Jackson was in splendid health and gave no evidence of or made any complaint as to any pains or suffering of any character. The above testimony, though very important as will subsequently appear, is not expert testimony.

In March of 1943 prior to the collision the next month, Jackson was examined for life insurance by Dr. Scales, who says that he gave him a very thorough examination and found no evidence of hernia. This same doctor on May 10, 1943 after the collision in April examined Mr. Jackson who was then suffering considerably, and did find a hernia, he says.

At the time of this collision Jackson was earning a salary of $225 per week and attending to his business at all times. After the collision he was never able to again pursue his duties in this position and in the course of a few months was forced to give it up and accept much lighter work in which he earned an average of $50 per week. There is no evidence of anything having happened to him in this interval other than the experience to which

he was subjected by the collision in question. This is not expert testimony, but it is quite relevant, we think, upon the question of whether there is any causal connection between the hernia, if any, and the collision.

At the time of the collision Jackson was sitting at a table in a dining car of the train. The impact threw him violently, he says, against the table and the chairs and under the table and on the floor, and he received what he describes as a very hard blow upon his stomach and penis by these parts of his body being thrown against the table or chair. Immediately, so he says, he began to suffer considerably. He went on to Nashville and his suffering was such that night that he consulted the hotel clerk as to the obtaining of a doctor, but none was readily available by reason of the scarcity of doctors during the war. He was directed the next morning to go across the street to the clinic of Dr. Nelson, a highly reputable and capable doctor. He was examined, but his suffering was not relieved and at the suggestion without improper motive of Dr. Nelson he was taken by the latter to the railroad's physician, Dr. Eve, another very reputable and outstanding doctor, and was examined by these two doctors. Dr. Eve testified that there was no evidence upon his stomach of having received any blow thereon. Dr. Nelson, who participated in this examination, testified that there was a moderate contusion on his stomach. A night or so later the suffering of this man became so intense that he was taken in the night to a hospital and administered a considerable quantity of morphine. Dr. Nelson says that in his opinion he was passing a kidney stone. He bases this upon the fact that he passed some blood. No kidney stone was found. The suffer-

210.

ing continued and Dr. Nelson sent him to doctors Lanier and McLure, two other doctors of very high standing in Nashville, for the taking of an X-ray picture as an aid in ascertaining whether he was suffering from a hernia. The X-ray pictures did not disclose a hernia. All the above doctors, except Dr. Lanier who did not testify, gave it as their opinion that Jackson was not suffering from hernia, but, if so, it was not a result of the blow received in the collision. One of these doctors says that it would take a very violent blow to result in hernia and there was an absence upon his stomach of the receipt of a lick Dr. Eve says, and in this is contradicted by Dr. Nelson. They likewise point to the failure of the X-ray pictures to disclose the presence of a hernia. It is not clear just what these doctors thought was the matter with Jackson, unless it be that they thought he was malingering. Dr. Nelson was of the opinion that he had kidney colic when taken to the hospital.

In view of the continued suffering of Mr. Jackson he went in the early part of May to Mississippi for consultation with and examination by Dr. Scales and Dr. Cox, they having been his doctors for some years. Dr. Cox was the man who had carefully examined Jackson for life insurance in March and at that time found no hernia. These two doctors are likewise reputable and capable. They testify that their examination disclosed a moderate hernia. They, too, took X-ray pictures which did not disclose the hernia. Both testified that it "frequently happens" that a hernia of this character is not found by an X-ray and in fact that it is "very unusual that you find it with an X-ray". Just before the trial in 1947 Jackson was sent by one of these doctors to an

eminent radiologist in Memphis whose name is Dr. Robertson. He examined Jackson and took X-ray pictures. He testifies that he found a hernia and that the X-ray pictures show it. He said that it was the character of hernia that "reduces itself automatically unless it should become incarcerated"; that "it is very elusive, very easy to miss—sometimes it is there and sometimes it is not—at times I find it and sometimes I don't. It all depends on whether you catch it in the sac or out of the sac". Dr. Robertson said that this hernia was "not an incarcerated" hernia and said that it "could have happened two or three years ago, any time . . . or ten years". When Dr. Robertson was asked "could that condition have been brought about by an injury", he replied "Oh yes sir . . . often hernias . . . are due to injuries". Dr. Nelson, who testified in behalf of the railroad, said that such a hernia as that described by these doctors, and which he did not ascertain existed "could be caused by a blow in the abdomen, particularly by a sharp or pointed instrument". Dr. Cox testified that the "usual cause of a hernia" is "some sudden wrench or traumatism . . . a sudden wrench will sometimes tear those muscles" but "some times it is delayed as much as two or three weeks" since the wrench "might cause a very small rent and it will gradually enlarge".

In the light of this evidence of those experts who testified at the instance of Mr. Jackson, his fine physical condition and total absence of pain and suffering up to the time of the collision, all as testified to by himself and Mr. Carpenter as compared to his condition, pain and suffering immediately and continuously thereafter, though not expert testimony, became quite relevant, com-

petent and important evidence upon the question of whether there is any causal connection between the collision and the hernia. In fact, in view of that non-expert testimony, uncontradicted in this record, considered in the light of and along with the testimony of the experts referred to, the jury was well warranted in concluding that the hernia resulted from the collision. Certainly this testimony supported such a conclusion. It would, therefore, have been error for the Circuit Judge to sustain the motion of the defendant for a directed verdict, or to have instructed the jury that no damages for the hernia in question could be awarded.

The learned Court of Appeals was, therefore, wrong in holding that the trial judge committed error in not instructing the jury that it could not award any amount of damages for a hernia on the ground that there is no evidence upon which such an award could be based. This applies likewise to the condition with reference to the penis, since Jackson testified that he received a blow there in this collision and that condition did not exist prior thereto, and one of the experts testified that its condition could have resulted from a blow.

The record is replete with evidence that Jackson suffered much pain, both physical and mental, and was subjected to very substantial loss of earning capacity by reason of this hernia which the experts testifying in his behalf say that he did have, and which they say could have resulted from the blow he received, and which the jury was justified in finding did result from the blow received in that collision, in view of the uncontradicted evidence as to his fine physical condition and lack of suffering continuously before the collision followed by the

opposite condition immediately and continuously after the collision, and by the fact that the doctor who found a hernia in early May after the collision in April had not found a hernia in what he says was a careful examination made in March before that collision in April.

It is apparent from what is said above that when the Court of Appeals held that the judgment of the Circuit Court should be affirmed it reached the right conclusion, even though that conclusion is based upon an erroneous ground. However, since it did reach the right conclusion its action in affirming the judgment of the Circuit Court will not be disturbed since, as heretofore stated, the well settled rule is that when the Court of Appeals reaches the correct result, but upon a mistaken theory as to the law, this Court, when considering a petition for *certiorari*, and basing its decision upon what it concedes to be the correct theory of the law, will not disturb that action of the Court of Appeals.

This in substance disposes of all assignments of error other than the one directed to the proposition that the damages are excessive. No doubt counsel predicate that proposition upon the theory that no damages could be awarded for the hernia, a theory which we have been constrained to reject. At any rate, we are of the opinion that there is nothing in this record to indicate that the sum awarded was the result of passion, prejudice or caprice. We cannot, therefore, disturb the award.

The petition for *certiorari* is denied.

All concur.

ON PETITION TO REHEAR.

The petition to rehear insists that "there was no expert testimony causally connecting plaintiff's hernia—if any, with the accident; and these questions should not have gone to the jury; that, therefore, this Court is in error in holding as a matter of law that there was any evidence to support a verdict based on plaintiff's hernia, contrary to the positive expert testimony (of petitioner's witnesses) that Jackson's hernia, if any, could not have resulted from the collision as described by him".

Petitioners cite *National Life & Accident Insurance Co.* v. *Follett*, 168 Tenn. 647, 80 S. W. 2d 92, 95, and the unreported case of *Brooks Sand and Gravel Co.* v. *Alfred Bond*,[1] Tenn. Sup., support of their insistence that our holding in this case should have been to the effect that only expert evidence could be looked to for the purpose of ascertaining whether the hernia, if any, was caused by the train wreck.

In *National Life & Accident Insurance Co.* v. *Follett*, *supra*, Follett died within a few hours after he came into his home suffering great pain and told his wife that he had fallen. An autopsy was performed, and three doctors testified that his death was due to a diseased condition of his organs. Two others, in response to an hypothetical question, gave it as their opinion that the alleged fall was the cause of his death. If his death was the result of a fall, then under his accident policy the insurance company was liable. Otherwise, if his death resulted from diseased organs. In that case, the Court rejected two insistences not at issue in the instant case. It held that the statement of Follett to his wife that he

---

[1]Not designated for Publication.

had fallen was competent as a part of the *res gestae*. Petitioner concedes in the instant case, as we understand the record, that Jackson did receive a blow as a result of the train collision. At any rate, all the proof is that he did. In that case it was further held proper to admit expert testimony in response to an hypothetical question that Follett's death was due to the fall. This Court, speaking through Chief Justice GREEN, made this observation directly appropriate here: ''Follett's vigor and activity prior to this accident, his death so soon thereafter, and the testimony of Dr. Kincaid and of Dr. Stern, all this was quite sufficient to take the case to the jury.''

Keeping in mind the quotation above, we note the statement in the petition to rehear that Dr. Cox and Dr. Robertson testified that they ''could not tell whether the hernia was of recent or long duration; plaintiff could have had it for ten years and not have known it''. The uncontradicted evidence is that one month prior to the collision Dr. Scales made a very thorough examination of Mr. Jackson in connection with the latter's application for insurance. He found no hernia. One month after the collision, this same doctor again examined Jackson and did find a hernia. We think that in view of this expert testimony, there is quite substantial evidence that the hernia of Mr. Jackson was of origin quite recent to its discovery by this expert. That discovery was shortly after the collision in which Jackson was injured.

Further, the undisputed evidence is that continuously up to the time of the collision, Mr. Jackson was in perfect health, a person of vigor and activity. He was an afflicted, disabled and suffering man continuously thereafter.

Jackson's testimony, and it is strongly corroborated by other circumstances, is that when the train collision occurred he was thrown violently against articles in the car and on the floor and received a severe blow upon his stomach. He thereupon immediately began for the first time to undergo a severe stomach suffering from which, in fact, he never did recover, and following which he eagerly sought physicians and a hospital to relieve that suffering.

Jackson testified (and we must accept as true his testimony upon the issue here) that there was upon his stomach physical evidence of the receipt of the blow which he received in that collision. It is true that one of the experts, called as a witness by petitioner, testified that he observed no evidence of a blow upon his stomach. Another, likewise called as a witness by petitioner, testified that he did find some evidence of a blow upon Jackson's stomach. They both give it as their opinion that the objective evidence which Dr. Nelson observed was insufficient to bring about a hernia, nothwithstanding the fact that after this collision he did have one, according to three experts; but did not have a hernia when carefully examined a month before the collision by one of these three, in so far as that one could discover. It seems to be conceded that a blow in the stomach can cause a hernia, and one of the doctors says that the "usual cause of a hernia" is "some sudden wrench or traumatism . . . a sudden wrench will sometimes tear those muscles".

Notwithstanding the contrary emphatic assertion of petitioner's counsel, we are entirely unable to escape the conclusion that all the evidence detailed in the paragraphs above is substantial evidence that the hernia was

due to the blow received in the train collision. Further, in the light of these rather convincing undisputed physical facts and results, we must keep in mind that: "The opinion of an expert may be reduced to mere conjecture by proof of physical facts completely inconsistent therewith". *Standard Oil Co. of Louisiana* v. *Roach*, 19 Tenn. App., 661, 675, 94 S. W. 2d 63, 69.

In a case where there is evidence of the character appearing in the record of this case the true rule, we think, is stated by this Court in *Tibbs* v. *Equitable Life Assur. Soc.*, 179 Tenn. 594, 599, 168 S. W. 2d 779, 781, viz.: "When the case concerns a highly specialized branch of medical science, with respect *to which a layman could have no knowledge* (as to the length of the prior existence of an ulcer which had ruptured), the court must depend upon expert testimony; and, in such case, *in the absence of substantial evidence to the contrary*, it is improper to submit the issue to the jury." (The emphasis is ours.)

The rule as re-stated in that case seems to be the rule generally. It is expressed in 20 American Jurisprudence, pages 731-732 thus: "Opinions of medical experts as to the cause of . . . personal injuries . . . based on personal observation and examination . . . go to (the jury) *to be weighed along with the other evidence in passing on the question of causation*". (Emphasis is ours.) From that which we have hereinabove said, it is clear to our minds that there is, in addition to the opinion of the medical experts testifying for the petitioner, "substantial evidence" contrary to their opinion. So, the trial judge was correct in submitting the issue to the jury.

Referring now to the unreported Sullivan County law case of *Brooks Sand and Gravel Co., Inc.* v. *Alfred Bond*,

upon which petitioner relies, a copy of which opinion is for our convenience attached to the petition to rehear, we find the facts of that case to be that plaintiff, who was in defendant's employ in the manufacture of ready mixed concrete, after several years of such work, became ill to the extent that he was forced to cease work. It developed that he had tuberculosis. It was his contention that this was caused from dust which he said filled the room in which he worked. The suit was predicated upon the allegation that his condition was brought about by the fact that his employer had failed to comply with certain sections of the factory inspection act. This Court in disposing of the case made this statement: "As we understood plaintiff's counsel on the argument, he appeared to concede that plaintiff had symptoms of tuberculosis prior to his exposure to this dust or at least prior to the development of any bad effect from such exposure."

In the instant case, as we have seen, there is positive testimony to the effect that a thorough examination by an expert very shortly prior to the train collision failed to disclose that respondent had a hernia. To the contrary, he was then in perfect health. An examination by the same expert very shortly after the blow disclosed a hernia. A usual cause of a hernia is a blow or wrench, so one expert in this record testifies. To that important extent, the case cited is wholly at variance with the instant case.

Further, in the case cited, there was no evidence whatever, physical or circumstantial, to the effect that dust had caused the turberculosis. To the contrary, the uncontradicted testimony of several experts was that the x-ray pictures "found nothing . . . to indicate the

effects of dust". It further was an undisputed fact that tubercular germs are in the lungs of many people and that "it is impossible to tell when these germs become active". We think the facts of that case make it entirely inapplicable to the above stated rule which controls here in view of the evidence here.

The petition to rehear is denied.

All concur.