ACT-O-LANE GAS SERVICE CO. v. HALL et al.--
248 S. W. (2d) 398.

Eastern Section.   January 10, 1951.

Petition for Certiorari denied by Supreme Court, July 27, 1951.

502

Strang, Fletcher & Carriger, of Chattanooga, for plaintiff in error.

Harry Berke, of Chattanooga, defendants in error.

HOWARD, J. These consolidated cases are for damages resulting from an alleged breach of contract. The declarations allege in sustance that on or about September 13, 1947, a representative of the Act-O-Lane Gas Service Company, hereinafter referred to as defendant, entered into a contract with plaintiff and his wife to furnish them a gas known as propane gas with which to heat their home, and that defendant's agent represented that said gas would produce a clean dry heat better than any other heat on the market; that defendant breached its contract because the heat furnished was neither good, clean nor dry, but instead gave off a heavy moisture which damaged everything in the house; that the "entire house was continually sweating and water was draining down the walls," and "the bed clothing, clothes and underclothing stayed continuously damp," and everyone in the house contracted a cold.

In the administrator's suit it is alleged that plaintiff's intestate, Carrie B. Hall, stayed in the home all the time, and that her clothes and the bedclothing became damp and wet because of the moisture produced by the gas; that in November, 1947, she contracted bronchitis and pneumonia, and that her condition later became so serious that she had to be rushed to the hospital; that her death in November, 1948, was "directly and proximately caused by the defendant's breach of its contract."

In the case of C. S. Hall, individually, the declaration is in three counts. In the first count Hall sues for doctor bills, hospital bills and other expenses alleged to have

been incurred in connection with his wife's illness, and for loss of services of his wife. In the second count Hall sues to recover for damages to his personal property alleged to have been caused by breach of the contract, and in the third count Hall sues to rescind the contract and to recover the amount paid defendant.

To each of the declarations the defendant entered pleas of not guilty and numerous special pleas as follows: (1) That it had not contracted as alleged; (2) that the plaintiff, C. S. Hall, had not suffered or been damaged in the manner alleged; (3) that plaintiff and his intestate had negligently failed to properly use the gas and appliances; (4) that the illness and death of Mrs. Hall was not due to the causes alleged; (5) that she had been in a diseased condition long before the alleged contract was made; and (6) that she and her husband had failed to secure medical attention when first needed.

The cases have been tried three times. At the first trial the jury could not agree and a mistrial was ordered. At the second trial there were verdicts for the plaintiffs and a new trial was granted. On the third trial the jury returned verdicts in favor of C. S. Hall, administrator, for $5,000, and in favor of Hall for $2,632.50. These verdicts were approved by the trial court, and upon defendant's motion for a new trial being overruled, this appeal was granted and perfected. A wayside bill of exceptions having been preserved of the first trial, this appeal involves only the first and last trials.

Following the established practice of our appellate courts to consider the record of each trial separately and in the order of time in which they occurred, we shall now proceed to consider the assignments of error directed to the first trial.

The defendant's chief complaint seems to be based on the trial court's refusal to sustain its motion for directed verdicts made at the conclusion of all the evidence, because, it is insisted, no evidence was adduced by the plaintiffs on which verdicts could be sustained.

The record reveals that the defendant corporation was organized in 1947, with its principal office in Chattanooga, and that it subsequently engaged in the sale and distribution of propane gas and various types of household appliances and heating equipment in which said gas was used; that in September, 1947, defendant's representative entered into a contract with C. S. Hall and his wife, Carrie B. Hall, to sell them appliances and propane gas with which to heat their home.

According to Hall's proof, the defendant's agent represented that the gas would produce a clean, dry heat and was better than any other heat on the market; that if there was any moisture in the gas it would burn the moisture up, it being so much hotter than any other gas; that upon these representations an agreement was entered into and defendant was permitted to install in the Hall home five unvented "space" or "room" heaters, with the necessary pipe connections to a tank placed in the back of the house where the gas was stored, at a cost of $382.50, and that no instructions were given as to how the heaters were to be operated or how the gas should be used. About the middle of November, 1947, during a cool spell, one of the heaters was started, and on the following day it was discovered that everything in the house was covered with moisture and water was running down the windows, doors and walls onto the floor; that later on the house became wet, damp and mildewed from the use of the gas, and the furniture became warped and buckled and the veneer peeled off; that the paint on the

walls and woodwork peeled off and the plaster cracked, and the glue in the dining room table melted and the table fell apart; that the piano and typewriter became damp and the keys stuck, and the entire interior of the house and everything in it was badly damaged from the dampness and moisture produced by the gas. As soon as this condition was detected by plaintiff he immediately notified the defendant who sent out its heating engineer, R. T. Lambert, and after a thorough investigation Lambert admitted that plaintiff and his family could not stand the moisture produced by the gas.

It appears from the proof that J. H. Murdock and M. O. Brannan, two other users of the gas, complained to defendant at about the same time, and that Lambert went to the Brannan home where in the presence of Brannan, Murdock and plaintiff he undertook to correct the condition by moving the heaters around in different parts of the house, and by opening windows to allow ventilation but that the moisture could not be prevented and the (Brannan) "house was completely wet from one end to the other."

In describing Lambert's efforts to prevent the excess moisture, Brannan testified:

"Q. 37. Now, Mr. Brannan, I will ask you if during the experiments if you burned as many as one, two or three, four or five heaters, if you burned all of them at one time and part of them at other times? A. That's right, that's right.

"Q. 38. Did you burn them every conceivable way at the suggestion of Mr. Lambert that you could? " A. Well, I did, and Mr. Lambert even was there two hours and done the controllings, most of it himself.

"Q. 39. You just let him handle it himself? A. I told him to go ahead and handle it and see what he could do about it.

"Q. 40. What was the result of burning the heaters when he handled it? A. No different. He throwed up his hands and said it was all—he couldn't do any thing else about it. ''

Regarding his efforts to ascertain the cause of the moisture produced by the gas in the Brannan home, Lambert, on cross examination, said:

"I told them that they couldn't stand it.

"X 52. Yes, sir. Yes, sir. And that's after you made the changes and made your own experiments? A. That is correct.''

■ It has been ably argued that the defendant's proof showed without dispute that the excessive moisture resulted from improper use of the space heaters; that by plaintiff lighting only one of the heaters at a time a certain amount of dampness was bound to have been created, and that all five of the heaters should have been used to properly heat the house. With this contention we are unable to agree. Hall and his daughter, Mary, both testified that they used all five of the heaters in an effort to dry out the house; that after the heaters had been on for just a short while the moisture and dampness produced by the gas became unbearable, and they could hardly breathe; that they cracked the windows for ventilation, but this did not relieve the terrible condition, and they were finally compelled to turn off the heaters and open all the doors and windows.

E. D. Chambers, operator of a tourist court near Ringgold, Georgia, testified that the defendant had installed space heaters in the separate units of his tourist court,

and that when the heaters were used everything in the room became damp, and that this condition could not be corrected by ventilation.

Plaintiffs called as witnesses numerous other users of the gas who testified without objections that the defendant's agent represented to them that the gas would give a good, clean, dry heat, but that instead it gave off a heavy condensation which damaged everything in their homes, and that the cracking of windows to permit ventilation did not remedy the situation.

Defendant introduced three witnesses who qualified as experts in the Petroleum Industry. They testified that propane gas contained a very small percentage of water, and that it would be impossible for the gas to produce the conditions complained of. They pointed out that the heaters were equipped with pressure reducing valves, and that it would be possible for only a tiny bit of moisture to pass through these valves; that if the gas contained too much water the valves freeze and the gas would be cut completely off. It is urged that the court should have directed a verdict on this undisputed expert testimony. One of the foregoing witnesses admitted that the defendant had received three cars of gas, which had not been tested for moisture, and that this gas was distributed to users in the Chattanooga area. While no expert testimony was introduced by the plaintiff to contradict the foregoing witnesses, plaintiff's proof was positive and convincing that the burning of the gas produced the moisture complained of, and it appears that the trouble could not be alleviated even by defendant's chief engineer.

■■ Where there is a conflict between expert or scientific testimony and testimony as to facts, the jury must determine the relative weight of the evidence. 20

Am. Jur. Sec. 1208, p. 1059; 32 C. J. S., Evidence, Sec. 572, p. 416.  And, "The opinion of an expert may be reduced to mere conjecture by proof of physical facts completely inconsistent therewith."  Nashville, C. & St. L. Ry. Co. v. Jackson, 187 Tenn. 202, 213 S. W. (2d) 116, 122.

It is insisted on behalf of the defendant that the uncontradicted evidence showed that Mrs. Hall was not attended by a physician between December 2, 1947 and January 2, 1948, and that no evidence of probative value was introduced to show a causal connection between the alleged breach of contract and the death of Mrs. Hall.

The evidence was undisputed that all (3) members of the Hall family contracted colds shortly after using the gas, and that because Mrs. Hall stayed in the home all the time she was more exposed to the moisture than the other members of the family; that Mr. Hall was in and out of the house all of the time, and that the daughter was regularly employed.  Prior to December 2, 1947, Mrs. Hall developed a severe case of laryngitis and bronchitis and was put to bed.  Dr. Shipp was called and when he arrived he discovered that the bed clothes were wet, and upon being told that the moisture came from the gas he suggested that the heat in the home be changed.  This was done immediately by the installation of a coal heater and the house dried out completely within two or three days.

Both Hall and his daughter testified that with the exception of a diabetic condition for which Mrs. Hall was given shots of insulin daily, she had previously been in perfect health, and that her activities consisted of her regular housework and frequently mowing the lawn; that she never recovered from the attack of laryngitis and bronchitis, and that from the time she contracted the cold her condition grew progressively worse; that later on

she was treated several times by Dr. Newell at her home as well as at his office. She was sent to Erlanger Hospital on January 12th where she remained until the 23rd when she was returned to her home in an ambulance; that she was later sent to the hospital on two or three other occasions before her death on November 18, 1948.

Dr. Shipp testified that when he first saw Mrs. Hall her heart was functioning properly and that in his opinion the bronchial congestion could have been caused from exposure to the excessive moisture in the home. As to the cause of her death Dr. Shipp testified:

"D 28. Docore Shipp, assuming that Mrs. Hall was sixty-eight years of age and was suffering from the condition which you found her in on Dec. 2, 1947, and also from the condition which you describe she was suffering from on the subsequent dates when you got there, state whether or not—and also assuming, Doctor, that she died from pulmonary edema and a heart congestion, state whether or not in your opinion the conditions for which you treated her caused or contributed or could bring about the condition from which she died. A. I believe it could. It could be the spark that set off the fire.

"D 29. In your opinion, was that spark that caused— A. I believe it was.

"D 30. In your opinion, was the condition from which she was suffering when you saw her and from which she lingered, would you say that condition, as it gradually became worse was the cause of her death? A. I believe it had a big part."

That Mrs. Hall was suffering from acute bronchitis on January 2, 1948, is borne out by the testimony of Dr. Newell who gave the following history of her illness:

"A. I was called out to the house to see her on January 2, 1948. At that time she was sick in bed, acutely ill with bronchitis. She had had a cold for some time, and gave a history of having had the cold since she had had some butane gas or some sort of gas put in the house the previous October. When I saw her she had fever, and she was—had a severe cough, and was acutely ill. I had to give her penicillin, and give her—put her on sulfa drug.

"D 12. What was the history of her progress from then on, Doctor? A. I was called back out the next day to see her, and she was slightly improved. I gave her more penicillin and told them that I would see her again in a day or so if she didn't get all right. Three days—two or three days later I made another call out there, and she was definitely improved, so I gave her penicillin. And she had given me also a history of having had diabetes for several years, so I told her she had better come up to the office and let me check when she got better, and so she came back to my office four or five days later and at that time she was still better, and her diabetes at that time was not bothering her. She—her—it was—her—the—the sugar test of her urine was negative, which showed that her diabetes at that particular time was not bothering her. I discontinued the sulfa drug and gave her another strong injection of penicillin, and told her to let me know if she had any further trouble, and I didn't hear from them until the 12th of January, which was six days after she was up at the clinic. At that time they said she was much worse, back down in the bed again, and would I come out, which I did, and found the lady very sick again with —all congested with bronchitis, severe cough, fever,

and I gave her another injection of penicillin and told her and her husband and her family that if she was not better the next day that I thought she had better be in the hospital, and the next day they called me and told me that she was no better and that— would I come out, and I told them better than that, I thought it would be better to have her sent directly to the hospital, which they did in the ambulance, and I went out and saw her at Erlanger, and she was having so much pain and congestion in her lungs at that time that I thought there was a possibility that she had had a heart attack, and so I told them I thought they'd better get Dr. Bibb, in, who had— who was an internist, to see her, and they did several days later. The next day, I believe, Dr. Bibb saw her. She had—at that time she had severe bronchitis. She had beginning pneumonia. And her diabetes was much worse due to the infection, and she was in serious condition. And as I said, Dr. Bibb, who specializes in internal medicine, took over the case a day or two later, and I did not see her after that, although she stayed in the hospital—I saw her from time to time in the hospital, but she had—I turned the case over to Dr. Bibb and he treated her the remainder of the ten days, I believe, that she remained in the hospital.

"D. 13. Doctor, state whether or not a woman of Mrs. Hall's type, if she was sleeping in a wet bedroom, wet bedclothing, and in a moist house, state whether or not that could cause the condition from which you found her to be suffering when you first examined her. A. Yes, it could.

"D 14. Now state whether or not that prolonged illness and the severity of the bronchitis and the

pneumonia you found her in, whether that could cause a heart congestion. A. It could.

"D 15. State whether or not a heart congestion could cause bronchitis edema. A. Yes.

"D 16. Assuming, then, that she died from the heart congestion or pulmonary edema, would you say that the condition which you found her. suffering from and from which she continued to suffer, could be the cause of her death? A. That's possible."

Dr. Newell further testified that when he first saw Mrs. Hall that her heart was functioning properly, and that he did not discover anything wrong with her heart until about January 16th. He also stated that the physical condition of a diabetic person who has the disease under proper control was no worse than that of a normal person; that unfortunately the disease could be made acute at times from infection.

Dr. John H. Moseley, resident physician of Erlanger Hospital, stated that he saw Mrs. Hall on the date of her death, and that she did not die from diabetes but from acute heart failure; that a prolonged illness of bronchitis and pneumonia could precipitate a heart congestion such as Mrs. Hall had. It seems that Dr. Bibb who treated Mrs. Hall at the hospital was available, but for some reason unexplained was never called as a witness.

While a jury will not be permitted to choose between two or more equally probable causes, for only one of which the defendant is responsible, it is sufficient if the cause for which defendant is responsible is shown to be as in the present case, the most probable cause. Coppenger v. Babcock Lumber & Land Co., 8 Tenn. App. 108; 32 C. J. S., Evidence, Sec. 1042, pp. 1127, 1128.

With regard to the nature of an opinion that may be rendered by an expert testifying to the causation of

injury or death, the rule is stated in 20 Am. Jur. as follows:

"The general rule is that a medical expert may express an indirect opinion as to the cause of injury or death. Such witnesses have been permitted to state what in their opinions was the 'possible,' 'probable,' or 'likely,' etc., cause of, or what 'might' or 'could' have caused, a particular physical condition. An opinion so expressed is not too uncertain. It seems to be permissible for an expert witness to express his opinion that the injury in question was due to, or caused by, 'some such' external violence as that which the plaintiff suffered. Some courts have adopted the rule in medical cases that although an expert may express an opinion as to what 'could' or 'might' have caused a particular physical condition or sickness, he cannot be permitted to express an opinion that an alleged cause 'did' cause the particular condition or sickness, where the actual cause is a disputed issue of fact, the ground being that in such case that question is the ultimate fact for the jury, * * * ." Sec. 869, p. 733.

██ Inasmuch as the undisputed medical testimony showed that Mrs. Hall's illness and death resulted from exposure to the excessive moisture produced by the gas, we think that this question was properly submitted to the jury, and generally where there is sufficient evidence to take a case to the jury, a verdict based thereon and approved by the trial judge will not be disturbed. Likewise, the trial judge did not commit error in submitting the case of Hall individually to the jury, since, as previously pointed out, there were numerous conflicts in the evidence for the jury to pass upon. In both cases there were questions on which fair-minded men could reach different

conclusions. Atlantic Coast Line Railroad v. Meeks, 30 Tenn. App. 520, 208 S. W. (2d) 355; Harrison v. Southern Railway, 31 Tenn. App. 377, 215 S. W. (2d) 31; Archer v. Archer, 31 Tenn. App. 657, 219 S. W. (2d) 919; Marable v. State ex rel. Wackernie, 32 Tenn. App. 238, 222 S. W. (2d) 234; Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 206 S. W. (2d) 806, 810.

The rule governing the determination for a motion for a directed verdict was discussed by Judge Felts, of the Middle Section of this Court, in Lackey v. Metropolitan Life Ins. Co., supra, as follows:

" 'There can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence * * * upon the issues to be tried.' (Citing cases.)

"As said so often, this rule requires trial judges and appellate judges, in considering a motion by defendant for a directed verdict, to look to all the evidence, to take as true the evidence for plaintiff, to discard all countervailing evidence, to take the strongest legitimate view of the evidence for plaintiff, to allow all reasonable inferences from it in his favor; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied." (Citing cases.)

We have carefully read the entire record of both trials which consists of more than a thousand pages besides numerous exhibits, and having endeavored to respond to all the assignments addressed to the first trial and discussed in defendant's brief, it is our opinion that these assignments are without merit and they are accordingly overruled.

We shall now proceed to consider the assignments directed to the third trial.

With the exception of three assignments which will be hereinafter considered, all the assignments addressed to the third trial are substantially the same and contain practically the same subject matter as those directed to the first trial; and having heretofore referred to the facts at considerable length, further reference thereto would not only be repetitious but would unnecessarily prolong our opinion.

Taking up the remaining assignments in their order, it is urged on behalf of the defendant that Hall and his wife were negligent in failing to take reasonable steps to prevent or remedy the condition upon discovering the moisture, and that their negligence bars any recovery as a matter of law.

As previously pointed out, Hall testified that he notified the defendant immediately upon discovering the moisture in his home the day after he started using the gas; that the defendant promised to remedy the situation immediately, and that Lambert, defendant's engineer, was unable to discover the cause; that after attempting to use the gas for only about two weeks he had it removed after he and the other members of his family contracted colds, and after Dr. Shipp recommended that he get some other type of heat. The repeated assurances of the defendant, after receiving plaintiff's notice, that it would remedy the condition, was sufficient justification for the plaintiff's failure to obtain other heat or take steps to minimize the damages, and, too, if plaintiff had obtained some other type of heat any sooner it seems to us that the defendant could have insisted that its gas had not been given a fair trial. Only where the evidence is susceptible of no other fair inference can the court instruct the jury

as a matter of law that plaintiff has been guilty of contributory negligence, which will bar a recovery. Osborne v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510. And generally the question of contributory negligence under proper instructions is for the jury. Patillo v. Gambill, 22 Tenn. App. 485, 124 S. W. (2d) 272; Duling v. Burnett, 22 Tenn. App. 522, 124 S. W. (2d) 294; Foster & Creighton Co. v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222.

Defendant complains of the trial judge's refusal to charge request No. 9 that Hall's failure to call as witnesses Dr. Bibb and Wm. S. Hall, plaintiff's son, who did not live in the home, raised an inference that their testimony would have been unfavorable to plaintiff's cases. We find no error in the refusal because the general substance of the request had already been covered in the court's charge. To deny a special request, the substance of which has been covered in the general charge, is not error. Jones v. Noel, 30 Tenn. App. 184, 204 S. W. (2d) 336; Graham v. Cloar, 30 Tenn. App. 306, 205 S. W. (2d) 764; Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450; Carman v. Huff, 32 Tenn. App. 687, 227 S. W. (2d) 780.

Finally insistence is made that the verdicts are so excessive as to show passion, prejudice and unaccountable caprice on the part of the jury. There are no specific charges of misconduct on the part of the jury, and the able circuit judge, after hearing the evidence adduced at both trials, approved the verdicts. Hall testified that he paid defendant $382.50 for the heaters, installation, etc.; that the damage to the real estate amounted to from $500 to $700, and to the household furniture $500; that the medical expenses were $1,556.65 and the funeral bill $900, making a total of more than $3,800. Under the

proof we do not think that the judgment awarded Hall personally in the sum of $2,632.50 indicated passion, prejudice or caprice on the part of the jury; nor do we think that the judgment of $5,000 awarded in the administrator's suit was excessive. Damages for breach of contract are allowable where they are not in fact remote or speculative, but are proved to a reasonable certainty. Black v. Love & Amos Coal Co., 30 Tenn.App. 377, 206 S. W. (2d) 432. The amount of damages is primarily a jury question, and a verdict approved by the trial court is entitled to great weight in this court, in the absence of a showing of fraud or corruption. D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S. W. (2d) 897; Carman v. Huff, supra; Ezell v. Post Sign Co., 30 Tenn. App. 256, 205 S. W. (2d) 13.

On appeals to this court, under our decisions, we must take the strongest legitimate view of the evidence in favor of plaintiff, construe it most favorably to him, and indulge all reasonable inferences to uphold the verdict. Western Union Tel. Co. v. Lamb, 140 Tenn. 107, 203 S. W. 752; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984; Osborne v. City of Nashville, supra; Good v. Tenn. Coach Co., 30 Tenn. App. 575, 209 S. W. (2d) 41. Applying the foregoing rule to the instant cases, we find there was evidence tending to establish the following circumstances: (1) There was a contract between the parties and the gas was not as represented by the defendant; (2) there was a breach of the contract resulting in damages to Hall; (3) there was a causal connection between Mrs. Hall's death and the moisture produced by the gas; and (4) that neither Hall nor his wife was guilty of contributory negligence.

The respective attorneys have ably and thoroughly presented these cases at the bar of this court, and it is

not without considerable effort that we have concluded that the errors complained of reveal no reversible error. Therefore, for reasons indicated, all assignments are overruled and the judgments below will be affirmed at defendant's costs.

McAmis, J., concurs.

Hale, J., dissents.