Paul VALENTINE, et ux.,
Plaintiffs-Appellees,

v.

CONCHEMCO, INC.,
Defendant-Appellant.

Court of Appeals of Tennessee,
Eastern Section.

July 6, 1979.

Permission to Appeal Denied by Supreme Court Oct. 22, 1979.

Ben W. Hooper, II, Newport, for defendant-appellant.

William M. Leibrock, Newport, Kenneth W. Kromer, Jr., Knoxville, for plaintiffs-appellees.

## OPINION

FRANKS, Judge.

This suit against the manufacturer, alleging negligence, strict liability and breach of warranty for the destruction of plaintiffs' mobile home by fire, resulted in a jury

verdict of $15,000.00. Responding to a motion for new trial, the trial judge suggested a remittitur of $5,809.30, which was accepted by the plaintiff but defendant has appealed charging numerous errors.

Plaintiffs purchased the mobile home in February, 1975, and it was destroyed by fire on the night of May 20, 1975. Plaintiff, Kenneth Valentine, testified that on the night of the fire he was awakened by his wife's screams and observed a "bluish glow" on the wall separating the bedroom and bathroom; he also observed flames and smoke inside the bathroom as he exited the trailer. He disengaged the electrical power supply to the home but the fire progressed rapidly and the entire trailer was engulfed in flames and totally destroyed. Janice Valentine confirmed the existence and location of the "glow".

At the trial, plaintiffs relied on an expert witness to establish their case against the manufacturer. The witness, Hal Sanders, is an experienced fire investigator and a consulting engineer by profession. In the course of his investigation, Sanders examined the remains of the mobile home with particular emphasis on the electrical circuitry and electrical appliances which were inside the trailer at the time of fire. Additionally, he examined a new mobile home of the same make and model. The witness offered the opinion, based upon his observations, that the fire had originated in an electrical outlet located in the wall separating the bedroom and bathroom. He concluded the cause of the fire was a short circuit in the outlet caused by condensation of moisture in the electrical outlet, with the source of the moisture being the bathroom. He further stated that the use of a non-weatherproof electrical outlet in that particular location violated provisions of the National Electrical Code.[1]

Defendant's employee in charge of assuring compliance with various safety codes, testifying as an expert, was of the opinion

that the outlet complied with the National Electrical Code. Defendant also offered evidence with respect to the procedures used in the course of manufacture of mobile homes to prevent the escape of moisture from the bathtub areas.

The assignments of error are:

1. The verdict of the jury is so excessive as to evidence passion, prejudice or unaccountable caprice.

2. There was no evidence to support the verdict of the jury on the issues of negligence, warranty or defect in design.

3. The Court erred in initially ruling that a defense witness had not been qualified as an expert.

4. It was error not to admit into evidence the business records of defendant relating to the standards of The National Fire Protection Association and Underwriter's Laboratories, Incorporated.

5. The Court erred in failing to charge the jury with the official standards for regulations of the National Fire Protection Association and National Electrical Code.

6. The Court erred in charging the jury on theories of negligence as there was no evidence of negligence on the part of the defendant.

7. The Court erred in charging the jury on theories of warranty as there was no evidence to support the allegation of any breach of warranty by defendant.

In support of the first enumerated assignment, defendant argues that another jury from the same panel at the same term of court had returned a large jury verdict in another mobile home fire case and, since plaintiffs only proved damages in the amount of $9,190.70, the verdict alone infers misconduct on the part of the jury.

---

1. In 1972, the General Assembly enacted the Uniform Standards Code for Factory-Manufactured Mobile Homes Act. Pursuant to the authority specially granted in *T.C.A.*, § 53–4805, the Commissioner of Insurance adopted the National Electrical Code. *See Rules and Regulations of the State of Tennessee,* vol. IV, Tennessee Department of Insurance, Division of Fire Prevention, chapter 0780–2–8, pp. 222–3.

The first argument is without merit because the record does not establish that this jury was drawn from the same panel or that any particular person served in the capacity as a juror in both cases and the assertion, if established in the record, would not *ipso facto* establish a basis of prejudice.

The second argument relates to the size of the jury verdict but the record establishes that the disparity between the jury award and the actual damages was the result of confusion rather than passion or prejudice. Plaintiffs sued for $16,503.39 compensatory damages and $10,000.00 punitive damages, and proved $9,190.00 actual damages.

After the jury retired to consider its verdict, the jury foreman returned with this inquiry:

> "*MR. TURNER:* I think you specified this and it just slipped our minds. I think you quoted a figure of $16,000 or $9,000, now we don't know which is which . . . ."

Defense counsel objected to the Court's clarifying the figures for the jury on the grounds that it would amount to a comment on the evidence. The Court declined to respond to the query and shortly thereafter the jury returned with the verdict. It is apparent the jury's confusion was not alleviated by the judge's response, a response endorsed by defense counsel. No passion or caprice can be read into their mistake, which was corrected by the remittitur.

The next assignment is directed toward the evidence presented by plaintiff. It should be noted at the outset the standard for review of a jury verdict is whether there is material evidence to support the verdict. *Prater v. Burns,* 525 S.W.2d 846 (Tenn.App.1975). The focal point of this assignment is the testimony of plaintiffs' expert, Sanders. The defendant charges the testimony by the expert that a malfunction of the non-weatherproofed, electrical outlet was the cause of the fire was mere speculation, not amounting to material evidence, because Sanders never actually observed the allegedly defective outlet. It is undisputed that the witness in a search of the wreckage was unable to identify the specific electrical outlet for examination.

The witness examined the remains of the mobile home in May or June of 1975; he systematically examined the remains of appliances in the area of the fire, the washer, dryer, clock radio, water heater and all of the outlet receptacles except the receptacle in the wall between the bedroom and bathroom. He testified that he was unable to locate the particular outlet in the wreckage although he made a diligent search. He determined from inspection of the other outlets and appliances that none of these had been the source of the fire.

Based upon those observations and his inspection of an undamaged mobile home of like make and model, and the location and appearance of the fire as described by plaintiffs, the witness concluded that the missing outlet had caused the fire. The defendant contends that this conclusion, offered without actual inspection of the outlet, was nothing more than speculation which "borders on perjury because it is so preposterous." This bold declaration is borne out neither by the evidence in this case nor the law.

The witness testified to extensive experience in fire investigation and a knowledgeable background in electrical codes. The witness relied upon the plans and specifications for the mobile home, his inspection of an essentially identical trailer and the Code in concluding that the outlet should have either been weatherproofed or placed elsewhere. He explained his theory of causation as follows:

*Q.* Alright, now let's talk about the moisture in the wall or in the cavity, how is that moisture going to get in when you've got a one piece single construction or one unit, fiberglass, plastic or whatever it is, tub-shower combination, how is it going to get in there?

*A.* There's a seam around the top of the shower stall that has a little chrome trim, which is one location. Around the location there's a plate that fits over the valve handle for the shower, the tub

and shower valves, moisture can get in there, warm moist air, we're not talking about like rain passing through, we're talking about warm moist air as it builds up in the bathroom then it passes into cooler areas and then it starts condensing out on cooler surfaces and . .

Q. . . . [W]hat happens when you get condensation on the cooler surfaces?

A. Well, you get droplets of moisture, droplets of water where it condenses and then it will run down towards the floor, and if it condenses on wiring then it will run down the wiring.

Q. Alright, what happens if it condenses on wiring and runs down the wire to the receptacle box?

A. It would run into the receptacle box, and over the terminals and the areas in the receptacle itself. The receptacle, the hot side and the ground strap are about a thirty second of an inch apart and they're separated by just a very very close tolerance on the separation between the two, and contamination of the water and moisture can cause the electrical break-down and current leakage at this point, it carbonizes the plastic insulation, micarda, or bakelite, the material that the receptacle is made out of.

Q. And what do you mean, "carbonize", what does that mean?

A. It means it burns it, it burns it and makes it—when it burns it becomes a conductor, . . . Plastic is an excellent insulator and as it carbonizes it becomes a very good conductor and conducts current leakage which in turn melts—it will literally melt the internal components right out of a receptacle without drawing enough current to trip the circuit breaker.

. . . . .

Q. Alright, when you have a breakdown, when you have a carbonization did I understand you to say it melts, sir?

A. Yes sir, that's correct, it just melts the . . . it will melt the steel, it will melt the copper components.

Q. Would anything else physically happen, other than the melting?

A. It just gets red hot or white hot.

Q. Alright, and then what happens? Anything?

A. Well, the molten metal drops out of it and it will ignite anything, wood ignites it at 400 degrees Fahrenheit and so we're talking about that copper melts it at 2000 degrees, so we know it's at least 2000 degrees, steel at around 3000 degrees, so you're talking about real high temperatures and we're talking about surfaces that ignite relatively easy, the carpet that was down there and the wood frame.

The witness's opinion of a defective design was not based solely on theory. He inspected the remains of the mobile home and eliminated to his own satisfaction all other possible electrical sources of the fire. He gave plausible reasons why he believed each particular appliance or outlet had not malfunctioned and his testimony, if believed by the triers of fact, would materially aid them in arriving at a conclusion on the issues on trial.

■ The fact that the expert's opinion was not based entirely upon observation, standing alone, does not reduce his testimony to speculation. Testimony by an expert witness may be premised upon his or her personal observation or upon facts presented in a hypothetical question, see Paine, Tenn.Law of Evidence, § 176, p. 190. The witness's opinion was based, in part, upon facts which he personally observed and the inability to examine the crucial outlet affects the weight rather than the probatory quality of his testimony.

Defendant has not cited any cases in direct support of his position, relying instead upon cases stating the general principle that verdicts may not be based upon speculation, e. g., Stinson v. Daniel, 220 Tenn. 70, 414 S.W.2d 7 (1967) and Gilreath v. So. R.R. Co., 323 F.2d 158 (6th Cir. 1963). Both cases hold that an essential fact may be proven by circumstantial evidence, and a

verdict based upon such evidence is valid. "The opinion of an expert may be reduced to mere conjecture by proof of physical facts completely inconsistent therewith." *Nashville, C. and St. L. Ry. Co. v. Jackson*, 187 Tenn. 202, 217, 213 S.W.2d 116 (1948), quoting *Standard Oil Co. of La. v. Roach*, 19 Tenn.App. 661, 94 S.W.2d 63 (1935). And "[w]here there is a conflict between expert or scientific testimony and testimony as to facts, the jury must determine the relative weight of the evidence." *Act-o-Lane Gas Service Co. v. Hall*, 35 Tenn.App. 500, 509, 248 S.W.2d 398, 402 (1951).

Defendant offered no evidence to contradict or disprove the facts upon which plaintiffs' expert relied; instead, it presented its own expert evidence to the effect that the placement of the outlet was in compliance with the Code, and other evidence tending to show the unlikelihood of moisture collecting in the area of the receptacle.

While plaintiffs' expert offered his opinion on the probable causation and ultimate issue, it was proper under the circumstances. *See Luallen v. Booher*, 62 Tenn.App. 155, 460 S.W.2d 24 (1970). We conclude the assignment is without merit and are constrained to observe the defendant made no formal objection at the trial of the case to the crucial opinions offered by the expert witness. "No principle of law is more firmly established than . . . when no objection to offered testimony or evidence is interposed, it may properly be considered and given its natural probative effect as if it were in law admissible." *Bryant v. State*, 503 S.W.2d 955 at 957 (Tenn.Cr.App. 1973).

The next assignment complains that the trial court erred by initially ruling defendant's witness had not been qualified as an expert. The ruling was in response to an objection by plaintiff and, after the objection was sustained, counsel for defendant elicited further testimony from the witness concerning his experience and qualifications pertaining to the National Electrical Code. The witness then offered his opinion that the location of the receptacle in question did not violate the Code and gave his reasons supporting that conclusion.

The trial judge has broad discretion on evaluating the qualifications of an expert witness. *Shelby County v. Barden*, 527 S.W.2d 124 (Tenn.1975). No abuse of discretion was shown by the trial judge's requiring additional qualifications of the expert. Moreover, the witness was allowed to state his opinion and its basis and any claimed initial error was rendered harmless.

Defendant complains of the trial court's refusal to admit two letters into evidence and insists, without elaboration, that the letters are admissible as business records under *T.C.A.*, § 24–714. No offer of proof was made and, consequently, neither of the letters is in the record. Thus, any assignment based on exclusion of that proof must be overruled. *Allen v. Lewis*, 63 Tenn.App. 76, 469 S.W.2d 489 (1971).

Defendant insists it was error for the trial judge not to read the relevant provisions of the National Electrical Code to the jury during his charge on the issue of violation of the Code. The trial judge, stated in his charge as follows:

There have been allegations in this case that the manufacturer was in violation of certain Governmental Standards, that is the standards set by the National Electrical Code and under certain circumstances this could constitute negligence per se, because these regulations have the effect of a statute. Now, whether a standard has been violated or not is a fact for you the jury to determine and whether a violation of that standard is the proximate cause of the damage is another question of fact for you to determine. You've heard the regulations read and I will not restate what those were, you've heard them mentioned by counsel and by the witnesses in the case.

The record establishes that the jury in the course of the trial was informed of the pertinent standards and, under the circumstances, the trial judge's decision not to read the standard during his charge does not constitute an affirmative error.

■ His action, if erroneous at all, was an error of omission; there is no indication that defense counsel made any attempt to call this omission to the trial judge's attention, as required by *T.R.C.P.*, 51.02. Nor does it appear that any affirmative request for reading of the standards to the jury was made. In the absence of request or objection, an assignment of error predicated upon an omission in the court's charge to the jury will be overruled. *Rule v. Empire Gas Corp.*, 563 S.W.2d 551 (Tenn.1978).

The last two assignments complain of the Court's inclusion of the theories of negligence and breach of warranty in his charge. Defendant argues that strict liability which was also charged has supplanted the stated theories in the field of products liability.

■ The assignments are without merit for several reasons. "[A] general verdict approval by the Trial Judge is not vitiated by the absence of proof on one or more counts of the declaration if there is evidence to sustain the averments of a single count." *Alex v. Armstrong*, 215 Tenn. 276, 286, 385 S.W.2d 110 (1964). Thus, even if these assignments were meritorious, the error would be harmless, *T.C.A.*, § 27–117, since there is material evidence of a defective condition sufficient to support a verdict on a theory of strict liability.

■ Strict liability has supplemented rather than eliminated the theories of negligence and breach of warranty, *see Browder v. Pettigrew*, 541 S.W.2d 402 (Tenn.1976), and the testimony of plaintiffs' expert supplied material evidence on each of the theories, *viz.*, whether the placement of the electrical receptacle in the walls abutting the bathroom violated the applicable safety code, thus constituting negligence *per se*; whether the location or design of the particular outlet was defective, rendering the mobile home unmerchantable.

For the foregoing reasons, all assignments are overruled and the judgment of the trial court is affirmed. Cost of appeal will be assessed against defendant-appellant.

SANDERS and GODDARD, JJ., concur.