# EAST TENNESSEE NATURAL GAS CO., et al. v. PETER PELTZ, et al.—270 S. W. (2d) 591.

Eastern Section.   March 18, 1954.

Petition for Certiorari denied by Supreme Court, July 23, 1954.

102

C. W. Key, and E. Bruce Foster, both of Knoxville, Andrew Ewing, of Nashville, J. H. McCartt, of Wartburg, for plaintiffs in error.

Jennings, O'Neil & Jarvis, of Knoxville, S. H. Justice, of Wartburg, for defendants in error.

HOWARD, J.  Referring to the parties as they appeared below, the plaintiffs, Peter Peltz and wife, Bridget Peltz, filed this action against the defendants, East Tennessee Natural Gas Company, hereinafter referred to as Gas Company, and John Oman III and Stirton Oman,

co-partners doing business as the Oman Construction Company, for damages for the alleged destruction of a concrete dam caused by the blasting operations conducted by the defendant, Oman Construction Company, upon the right-of-way of the Gas Company, while laying a 22 inch natural gas transmission line referred to as the Greenbrier-Oak Ridge line, and for the casting of debris, rocks, etc., upon the property of the plaintiffs adjacent to the right-of-way.

At the time the matters herein arose the Gas Company, a corporation organized and existing under the laws of the State of Tennessee with its principal office at Knoxville, was engaged in supplying and the distribution of natural gas throughout East Tennessee. The Oman Construction Company maintained its office at Nashville, Tennessee, and at the time was under a contract with the Gas Company to construct the gas line in question.

Plaintiffs are residents of Morgan County, Tennessee, where they have lived for more than 33 years, having moved into said County in 1919 from the State of Pennsylvania, where Peltz had worked previously for 8 years as a coal miner. They are of Polish descent, self educated, frugal and ambitious, and by their efforts have acquired ownership of several hundred acres of farm and timber lands located in the 7th Civil District of Morgan County, near the Village of Deer Lodge about 14 miles west of Wartburg, the County Seat. Plaintiffs acquired their land by the purchase of 8 separate tracts purchased at different times, but only 4 are mentioned in the record. They are (1) the 100 acre tract on which the family residence was located; (2) a 50 acre tract about ¾ mile away upon which the dam involved herein was erected; (3) a 40 acre tract and (4) a 50 acre tract adjacent to each other, and abut-

ting the 50 acre ''dam tract'' on the northeast. The tracts 2, 3 and 4 were unfenced, uncultivated and had no improvements on them except the dam, which was erected by the plaintiffs in 1948, 1949. The Gas Company's pipe line right-of-way passed through tracts 3 and 4, and at its nearest point was about 1500 feet from the dam and approximately 700 feet from the water line of the lake.

In 1945, before Peltz decided to erect the dam, he contacted M. P. Gowder, State Engineer with the Agriculture Extension Service at the University of Tennessee Farm in Knoxville, whose duties were to assist farmers in the solution of their problems. At Peltz's request Gowder visited the dam site, where, assisted by Peltz and Charlie Edwards, the then County Agent of Morgan County, he made a survey and preliminary estimate of the cost. Later, Gower prepared plans and specifications for the dam. The plans, completed in 1946, called for a masonry and concrete dam with expansion and contraction joints at 4 points. These joints were between the spillways and wingwalls and the spillways and the center pier. The plans specified wingwalls 24 inches thick with footings at the base of the dam 16 inches thick, in solid rock to prevent seepage. The specifications for the concrete called for a mixture or formula of 1-2-4, meaning 1 bag of cement, 2 bags of sand and 4 bags of aggregate or gravel, reinforced by steel of ⅝ inch or larger. After studying the plans Peltz abandoned the idea of using masonry and decided to build the dam of solid concrete.

Before starting construction of the dam Peltz, assisted by the members of his family, his neighbors and hired labor, removed all the trees and cleared the basin for the lake, and with a bulldozer removed the surface dirt and everything down to solid rock on which the dam was to be

constructed. Three branches assured an ample supply of water, and it was admitted that the site selected was an ideal location for the dam. Plaintiffs started construction of the dam in February, 1948 and completed it in May, 1949, the basin filling completely by the following June.

The dam was described as having an upstream wall about 206 feet in length and a downstream wall about 156 feet in length. At the north end of the structure there were two parallel walls each 26 inches in thickness, and these walls extended south to a spillway section, at which point the walls were approximately 20 feet high. The spillway section consisted of two solid monolithic blocks of concrete, each 10 feet wide and 18 feet high. They were 10 feet in thickness at the base and tapered to about 4 feet in thickness at the top. One of these was on each side of a center pier which was approximately 4 feet wide. At the south end of the south spillway section two parallel walls of concrete, each 26 inches in thickness, extended for a distance of 81 feet to the south bank of the ravine. The space between these two walls was supposed to have been filled in with crushed stone, but had been only partially filled at the time of the failure. That part of the dam which failed consisted of 25½ feet of the 81 foot south section of the dam, and on the night of October 31, 1949, this portion washed out.

On July 11, 1949, the plaintiffs executed a deed granting the Gas Company a 50 foot right-of-way across tracts 3 and 4, for the purpose of extending the Greenbrier-Oak Ridge gas line then under construction, and subsequently, in preparation for the laying of the gas line, the defendant, Oman Construction Company, dug a trench approximately 40 inches wide down to the rock along the center of the Gas Company's 50 foot right-of-way at a point about

1500 feet east of plaintiffs' dam where it crossed one of the branches that flowed into the lake. By the use of wagon drills with bits 2¼ inches in diameter, two lines of holes were then drilled into the exposed rock in the trench. These holes were staggered and were about 3 feet apart and ranged in depth from 6 to 8 feet, and the lines extended for a considerable distance beyond the branch on each side. The holes were then packed with 40% dynamite, using 5 or 6 sticks to the foot, for a distance estimated at from 700 to 800 feet, and by the use of a battery the complete charge, ranging from one and one-half to two tons, was set off in one blasting on the morning of September 21st.

Plaintiffs' declaration was in 4 Counts, the first Count alleging in substance that the plaintiffs had constructed a concrete dam at great expense, that the defendants used excessive charges of dynamite in their blasting operations, which were negligently done, and that the defendants failed to exercise the necessary care to protect plaintiffs' property. The second Count alleged that the defendants did not confine their operations and blasting activities to the 50 foot right-of-way, but unnecessarily encroached upon plaintiffs' property. The third Count alleged that the defendants, in causing the damage to the dam, committed a trespass upon plaintiffs' property, and the fourth Count charged that the defendants, in using high explosives, were insurers for damages resulting therefrom.

Defendants interposed pleas of not guilty and filed numerous special pleas in which it was denied that they trespassed upon plaintiffs' property; denied that plaintiffs' property was damaged as alleged; denied that any damage to plaintiffs' property resulted proximately from

the blasting, and denied that plaintiffs had either legal title to the property or were in actual possession. They averred that plaintiffs' dam disintegrated because of faulty, insufficient, improper and unsafe construction, that because of the faulty design, workmanship and inferior materials the dam was incapable of withstanding the atmospheric changes occurring at the time; that plaintiffs were guilty of proximate contributory neglience and had failed to exercise due care and caution in reducing and minimizing their losses and damages.

For further plea the defendants averred that on July 11, 1949, the plaintiffs for valuable consideration executed a deed granting the Gas Company a perpetual right-of-way and easement upon and through their property for the purpose of laying the gas main, and pleaded accord and satisfaction as a complete bar to plaintiffs' suit.

To the foregoing plea the plaintiffs filed a replication, alleging in substance that said right-of-way deed dated July 11, 1949, was void and of no effect, because (1) the consideration paid therefor was inadequate, and (2) its execution was procured by fraud and misrepresentations, in that at the time and prior thereto, the agent of the Gas Company assured plaintiffs that no part of their property outside the fifty foot right-of-way would be damaged.

Upon issues being joined, the case proceeded to trial. There were two trials in which the defendants made separate motions for peremptory instructions at the conclusion of all the evidence introduced. These motions were based on no material evidence to support a verdict and were overruled. The first trial resulted in a jury verdict for the plaintiff for $19,000, followed by a motion for a new trial and for a directed verdict. The trial judge granted the motion for a new trial on an error committed

in the charge, but refused to direct a verdict, and the defendants preserved and have filed a Wayside Bill of Exceptions. The second trial resulted in a jury verdict for the plaintiffs for $28,600, $28,000 on the 1st, 3rd and 4th Counts of the declaration, and $600 on the 2nd Count. Upon motion for new trial and for a directed verdict the court overruled both, but granted remittiturs of $4,000 on the larger amount and $450 on the smaller, reducing the total to $24,150.00, and judgment was accordingly entered. The defendants have appealed and of the 44 assignments of error presented, only one is directed to the Wayside Bill of Exceptions.

Following the established practice of our appellate courts to consider the record of each trial separately and in the order of time in which they occurred, we shall first consider the assignment directed to the first trial.

Under the first assignment the defendants contend there was no evidence to support a verdict for the plaintiffs, and that the trial court erred in refusing to grant their motion for peremptory instructions made at the conclusion of all the evidence. Three grounds are urged in support of this assignment, as follows: 1. That the undisputed evidence not only failed to show any causal connection between the blasting and the failure of the dam, but it showed conclusively that the blasting could not have caused any damage to the dam. 2. That since the defendants in the exercise of eminent domain entered upon the right-of-way under grant of an easement, they were entitled to do such blasting as was reasonably necessary to the full enjoyment of the purposes for which the easement was acquired, and the general rule of ''absolute liability'' would not apply; that they would not be liable in the absence of negligent or excessive blasting. 3. That plaintiffs

failed to establish either legal title to or actual possession of the land upon which the dam was constructed.

The rule is well settled that where there are conflicts in the evidence, this Court cannot assume the duty of determining liability or non-liability in tort actions but must leave such duty with the jury as the triers of facts. Jackson v. B. Lowenstein & Bros., 175 Tenn. 535, 136 S. W. (2d) 495. Only where one conclusion can be reasonably reached from the evidence and inferences is it proper for a trial court to direct a verdict. Coca Cola Bottling Works v. Selvidge, 4 Tenn. App. 558; Supreme Liberty Life Ins. Co. v. Pemelton, 24 Tenn. App. 576, 148 S. W. (2d) 1. And where there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from all the evidence, a motion for a directed verdict must be overruled. Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 206 S. W. (2d) 806.

According to Peltz and his daughter who assisted him, they chiseled a trench into the solid rock 8 or 9 inches deep for the entire length of the dam for the footings, and filled this trench with the concrete mixture as specified by the plans; that he made the wingwalls 26 inches thick instead of 24 so that they would be stronger. Three layers of heavy roofing paper were put in each of the four expansion joints, and unable to obtain steel, he purchased 3,400 feet of ⅝ inch wire cable which was used both vertically and horizontally to reinforce the dam.

In constructing the dam Peltz testified that he followed substantially the design prepared by Gowder; that he used the 1-2-4 mixture recommended, using 1,300 sacks of cement, and by reason of having built several concrete buildings for himself he knew how to mix concrete; that because of his previous coal mining experience he was

familiar with rock formations generally, and that the rock on his farm in the dam area was of sandstone formation in layers of from 2 to 8 inches thick (described in geological terms as stratified or laminated), with earth deposits of clay or sand between the layers, and that the rock strata underneath the pipe line had a gradual downslope to the dam site and was of the same rock formation. He stated that he raised cattle and sheep and specialized in growing potatoes and other crops on his farm, and that he intended to use the dam for irrigation, recreation and power purpose; that when the dam was completed in May, 1949, it was in "A-1 condition" and that by the middle of June the basin had filled, forming a lake covering from 8 to 10 acres, which he stocked with fish. Peltz completed the dam as heretofore described at a cost of $15,020.10, excluding the rock, sand and other materials which he had at his disposal. There was ample evidence showing there were no visible cracks in the structure of the dam prior to and up to 24 hours before the blasting on the morning of September 21, 1949.

Plaintiffs and others who visited the dam two days after the blasting testified without contradiction that they not only saw dead fish in the lake, but found 3 or 4 cracks in each wingwall, extending from the top to the bottom of the dam with water seeping through; that during the following weeks the cracks grew larger through which the excessive drainage reduced the lake to about one-half its original size, and on the night of October 31st, following a heavy rain, a portion of the south wingwall washed out.

The uncontradicted evidence further showed that the defendants did not confine their operations to the right-of-way, but went beyond its limits where they not only

destroyed all the timber for 25 or 30 feet along the north side, but with heavy machinery pushed large rocks, dirt and other debris thereon, which was never removed. The cost incident to removing the rocks etc., and restoring plaintiffs' land was estimated at $5,000.

Plaintiffs' witness M. T. Gowder, who visited the dam while it was under construction, testified that Peltz appeared to be following his plans with reasonable accuracy. He described the structure as a "low dam," being less than 30 feet in height, and denied that it was faulty or incapable of withstanding atmospheric changes. He said that the dam was in keeping with designs for dams promulgated by the U. S. Department of Agriculture and the U. S. Bureau of Standards, but stated that the dam was not constructed with the view of withstanding blastings. He further testified that he had supervised the construction of more than 1,000, and that there were from 300 to 400 in Middle and East Tennessee; that the lateral pressure of water on a dam up to 30 feet was of little significance, and that neither expansion or contraction in such dams would have any effect on the structure, nor would weather forces alone cause deterioration. Describing the materials being used at the time he saw the construction, and the dam's durability to withstand atmospheric conditions after completion, Gowder testified, as follows:

"Q. Did you notice the concrete that he was putting in there, the sand, for instance, that he was using? A. Yes, I saw the sand and the aggregate.

"Q. Were those or not proper materials? A. It was good material; it was satisfactory material for concrete construction.

"Q. In other words, so far as you could tell, the

cement, sand, and stone he was using there were proper materials? A. Yes.

\* \* \* \* \* \*

"Q. You classify as a low dam anything less than 30 feet in height? A. Yes. The reason we do, any dam more than 30 feet high, due to atmospheric changes in this region will easily crack and break itself. I think you will notice that yourselves in highways; highway contractors sometimes make those spans 50 to 100 feet, and they crack themselves. That is due to the contraction and expansion. When you get beyond 30 feet it is the nature of concrete to break itself. That just happens to be one of the laws of nature we can't do anything about.

"Q. Since this is under 30 feet, in this instance 23 feet, that is of no concern? A. No, the expansion or contraction would not affect it enough to cause it to deteriorate, or because of the weather forces that cause deterioration.

"Q. Now was this dam in your opinion of a faulty design which would have been incapable of withstanding atmospheric changes? A. Well, as best I could tell, the construction and materials were sound enough to withstand whatever atmospheric changes might take place, or whatever force it might be subjected to."

Plaintiffs, their daughter and several witnesses, including five employees of the Oman Construction Company at the time, described the force and intensity of the blast, as follows:

Peltz, who was a mile and a half away, compared the blast to a big storm with lightning striking nearby, shaking the earth all around him. He said that he later

went to the scene where he found large pieces of rock that had been hurled by the blast for a distance of from 150 to 200 feet from the right-of-way.

Mrs. Peltz, who at the time was in her home, stated that when the blast occurred the house shook, the unfastened doors in the frame of a cupboard fell out, and that she experienced the hardest jolt she had ever felt, shaking her from her head to her toes; that their home was located about a mile away, and that the dam was between their home and the right-of-way.

Mrs. Smarsh, plaintiffs' daughter who was visiting in her parents' home, described the blast as being so powerful that it shook the house, rattled the dishes, and the cupboard doors fell out of the frame; that the vibrations were so great that she thought it was an earthquake.

Andrew Byrd, a Justice of the Peace who lived more than a mile from the dam, described the blast as being the loudest explosion he had heard during the construction of the pipe line, and that the ground shivered like a young earthquake.

The following five witnesses were employed by the Oman Construction Company at the time of the blast.

Lum Webb, "a powder man" with 6 or 7 years experience, stated that he had done a lot of blasting but had never set off any blasts as heavy or as long as the one in question; that he assisted in the loading of the holes, and that they loaded heavy; that they were instructed on several occasions by Verbal Wade, the foreman, to load heavy and get to the bottom of the trench in "one shot" as they didn't want to have to return for further drilling; that at the time of the blast he was standing about 1,000 yards away and that the earth shook and vibrated considerably around him.

Joe Hopkins, a member of the powder gang, described the blast as the biggest to his knowledge that had been set off in that area; that his employer seemed to be in a hurry to get the pipe line laid, and that Verbal Wade, the foreman, had told him that it was a rush job and that he wanted the powder gang to load heavy and keep up with the drillers; that J. C. Works, the Overall Foreman, also told the powder gang "to load heavy and shoot hard" and that Works specifically said to him, "Son, I never run a man off for shooting hard, I always run them away for shooting easy"; that when the blast was set off he was 400 yards away behind a hill, and that considerable vibrations accompanied it.

Thomas Landrum, also a member of the powder gang, who was three-fourths of a mile away, described the blast as the heaviest fired, and that he thought the powder house had blown up.

Boyd Davis, a wagon driller, described the blast as an "awful heavy blast"; that it shook the earth and pieces of rock averaging in weight from 75 to 100 pounds were hurled a distance of from 250 to 300 feet in all directions; that at the time he was about three-fourths of a mile away.

Elmer Burnett, a jackhammer operator, who was standing behind a tree in the right-of-way 370 steps away, described the blast as so terrific that it shook his clothes and caused the dirt and rock which had been dug from the trench to roll back into it.

Plaintiffs also introduced as a witness Dr. Paris Stockdale, head of the Department of Geology and Geography at the University of Tennessee, who stated that he had visited the scene where plaintiffs' dam was constructed and also where the blasting occurred for the purpose of examining the rock formations, and that he found "the

same rock formation lies under both sites." He described the rock formation as being of the coarse grain, sandstone type, in layers from 6 to 8 inches thick, between which might or might not be found earth deposits. He stated that this type of rock formation would transmit vibrations "further because it is less dense and less rigid" than solid rock, and upon being asked to state the reasons he testified, as follows:

"A. Well, when any sort of explosion, whether of natural or artificial cause, or any jar is set up, the rock next to it are sending off vibrations. The vibrations set off in the rock gradually die out, depending, of course, on the intensity of the initial cause. That is characteristic of any rock, to transmit what we call earth vibrations. Does that answer your question?

"Q. That's all right. Now, Doctor, these vibrations, do they travel in a straight line, or travel like waves in water? A. Are you talking about the path of the vibration or individual vibrations?

"Q. The path. A. The vibrations will follow the path in all directions.

"Q. Then I guess I mean the individual vibrations.. A. There are various kinds of vibrations, some are what we call "push-pull"; some push out; some push-pull; these sort of undulate; they are a complex mixture of waves.

"Q. A vibration set up at one point in a rock shelf does it or not follow that shelf until it dies out in the distance? A. The vibrations will go in all directions. Some will go downward, follow that direction. Some of them will go in other directions, depending on which direction it starts.

"Q. Assuming the top of the rock by reason of the

collection of rock, sand, etc. at the bottom of the lake or pond where water has been collecting there for several months, do or not those vibrations pass through that when set off? A. Yes, vibrations will be of greater intensity, greater magnitude in lesser density; that is well known.

"Q. When they go through solid rock, then silt or sand, and then have water on top? A. Yes.

"Q. Do vibrations go faster through that? A. No, they go more slowly through that.

"Q. What would be the size of them? A. They will be greater.

\* \* \* \* \* \*

"Q. In other words, assuming you had a dam setting down resting on rock, and then you had behind that dam there was water with whatever silt, sand or the mixture might be at the bottom, and then the water standing up on top of that, you mean the vibrations would go through each of those different masses at different intensities? A. That is correct.

"Q. And at different speeds? A. That is correct.

\* \* \* \* \* \*

"Q. Now, would the vibrations that were set up from say a ton and a half of dynamite being set off at that distance, would they continue even further than fifteen hundred feet? A. I would think there would be no question but what they would.

"Q. How far would they extend? A. That depends on what you mean, to pick up by instruments, or—the full experience might be picked up with very delicate instruments in terms of miles.

"Q. We are speaking of vibrations in terms of

what ordinary men might feel in ordinary vibrations.
A. Thousands of feet, if not miles.

"Q. Doctor, I understand you have these vibrations that go through water, rock, sand, and so forth. In addition to that is there or not an air blast? A. Yes, I think so.

"Q. Would the waves or vibrations set off by say a ton and a half of dynamite fifteen hundred feet from the dam, the water six hundred and fifty feet from the location of the dynamite setting off the blast, would or not those vibrations reach the dam, would they reach there in a short time, or a long time? A. They would reach there in a split second.

"Q. In a split second. When a charge of dynamite goes off, which do you feel first, the flow of vibration or hear the report?

\* \* \* \* \* \*

A. If you feel the jar, you should feel it before the report of the noise. That is just a matter of mathematics.

"Q. In other words, these vibrations go faster than the speed of sound? A. Yes.

On being asked to give his opinion on a hypothetical question as to whether or not the vibrations emanating from the blast might have caused the cracks in the dam, Dr. Stockdale replied: "In my opinion the earth vibrations would reach that distance under these conditions. There are no geological factors to prevent them reaching that distance. In my opinion there could be damage done to certain types of structures."

In support of the defendants' contention that the evidence conclusively showed there was no causal connection between the blasting and the failure of the dam, it is

argued (1) that the undisputed evidence showed that the dam disintegrated from "internal failure" instead of from the blasting, and (2) that the defendants proved as a scientific fact that it was impossible for a blast of 2 tons of dynamite 1,500 feet away to have had any effect whatever on the dam, and they relied upon the testimony of Thomas J. Rentenbach, a Civil Engineer who has had much experience in the erection of concrete structures, including the football stadium at the University of Tennessee; Kenneth W. Mackenzie, of the Construction Materials Laboratory at Knoxville, Tennessee, and Dr. Don Leet, Professor of Seismology at Harvard University, Cambridge, Massachusetts, and the inventor of the Seismograph, an instrument used to detect among other things earth movements and the force and length of vibrations resulting from earthquakes, explosions, etc.

At the defendants' request, Rentenbach visited the dam site on three different occasions, the first visit being in February 1950, the second in March following, and the third during the summer of 1951, for the purpose of making an investigation as to why the dam had failed. From his survey and investigation he was of the opinion that the dam failed from a number of causes.

According to Rentenbach the four expansion joints in the dam were insufficient to allow for adequate expansion and contraction during atmospheric changes; that to allow for adequate expansion there should have been an expansion joint of approximately one inch for every thirty feet, and that none were put in the wingwalls. He stated that 2,500 sacks of cement should have been used instead of 1,300, and that the dam should have been reinforced by 5/8 inch steel; that the concrete mixture appeared to be very poor due to the lack of a sufficient

amount of cement and the use of soft rock of sandstone formation; that samples which he picked up at the dam site showed a void or lack of contact between the rock aggregate and cement, and that he crushed these samples with his fingers; that in his opinion "the fall of the temperature set up contraction stresses in the concrete to such an extent that added to the other stresses which had been imposed previously on the concrete, it had to fail at that time; and that the primary cause of the failure of this dam on the date it did was that the contraction stress exceeded the strength of the concrete."

██ ██ It appears that the testimony of Rentenbach was in sharp conflict with that of Peltz and plaintiffs' witness Gowder regarding the quality and sufficiency of the material used in the dam, the number of expansion joints required, and the durability of the dam to withstand atmospheric changes. These conflicts presented questions for the determination of the jury, the triers of facts, as the rule is well settled that where there are conflicts in the evidence and conclusions to be drawn therefrom, a jury question is presented. Lackey v. Metropolitan Life Ins. Co., supra. Furthermore, the U. S. Weather Bureau Reports introduced in evidence showed no extreme changes in the temperature of the weather prior to September 20, the date the evidence showed that the dam was in good condition. From September 20 to 23, when the cracks were discovered in the dam, the temperature reached a high of 75 degrees and a low of 40. This was not out of line when compared to the other changes in the temperature in that area for the four previous months, which were as follows: May, high 85, low 42; June, high 86, low 54; July, high 92, low 61, and August, high 85, low 51, and it appears that the dam weathered these atmospheric changes without noticeable damage.

On one of Rentenbach's visits to the dam site, it appears that he obtained several pieces of the concrete, which were delivered to Kenneth W. Mackenzie, at the latter's Laboratory in Knoxville, for a pressure resistance test. In making the test Mackenzie testified that he put a 4¼ inch cube of the concrete into an hydraulic press and upon applying pressure the cube showed a resistance of 19,000 pounds before breaking, or 993 pounds per square inch, and that the average compression resistance of a concrete cube this size made of the 1-2-4 formula was 3,000 pounds per square inch.

While it appeared that the pieces of concrete from plaintiffs' dam showed less resistance to pressure than similar tests of concrete of the 1-2-4 mixture, the defendants introduced no evidence showing just what the lateral pressure of the water was on the dam. On the other hand, Gowder testified that "the concrete was heavy enough to stand there and withstand any lateral pressure exerted against it by the weight of the water"; that up to 30 feet the lateral pressure of the water was of little significance. Furthermore, as previously pointed out Gowder also testified that "the construction and materials were sound enough to withstand whatever atmospheric changes might take place or whatever force it might be subjected to." Under these circumstances, it was for the jury to determine what weight and credibility it would give to the test made by Mackenzie, as from all the evidence bearing on the test, the jury could draw different conclusions. Lackey v. Metropolitan Life Ins. Co., supra.

Dr. Leet, who was introduced as an expert witness, first visited the dam site on June 29, 1951, at which time it appears that he made an examination of the dam

and the intervening terrain between it and the pipe line. From his examination he found that the elevation of the pipe line at its nearest point was 35 feet higher than the top of the dam, and in answer to a hypothetical question he stated that the blast under the conditions then existing could not possibly in any way have produced any damaging effects to the dam; that the vibrations from the blast at the dam would be only .003 of an inch, or as he described it about the thickness of an ordinary sheet of writing paper, and that in his opinion the disintegration of the dam was caused by internal failure as evidenced by a large number of fragments which he examined showing insufficient strength to hold themselves together. He admitted, however, that a blast of dynamite produced different vibrations in combinations of rock and earth, and that these vibrations would be 30 times greater in silt than rock, 10 times greater in sand than rock, and that a blast would produce variable results, each one different from the other. Dr. Leet asserted that plaintiffs' witnesses were confused in relating their experiences as to what occurred at the time of the blasting; that what they actually experienced resulted from air vibrations set in motion from the concussion rather than from earth vibrations, and he compared the force of the air vibrations at the dam to a 10 mile per hour breeze; that it was these air borne pressures that caused plaintiffs' house to shake, the dishes to rattle and the doors to fall out of the cabinet. Dr. Leet was not asked and he did not say that these same 10 mile per hour air borne pressures caused the rock and dirt which had been recently dug from the pipe line trench 450 feet away to roll back into the trench. Inasmuch as Dr. Leet's testimony was in conflict with physical facts testified to by plaintiffs' witnesses, and also Dr.

Stockdale's testimony that vibrations from the blast would travel "Thousands of feet, if not miles," and who was of the opinion that earth borne vibrations could damage certain types of structures within the area, it was for the jury to weigh and judge the credibility of Dr. Leet's testimony in the light of these conflicts.

■ ■　Where there is a conflict between expert or scientific testimony and testimony as to facts, the jury must determine the relative weight of the evidence.　Act-O-Lane Gas Service Co. v. Hall, 35 Tenn. App. 500, 248 S. W. (2d) 398; 20 Am. Jur. Sec. 1208, p. 1059; 32 C. J. S., Evidence, Sec. 572, p. 416.　And, " 'The opinion of an expert may be reduced to mere conjecture by proof of physical facts completely inconsistent therewith'." Nashville, C. & St. L. Ry. Co. v. Jackson, 187 Tenn. 202, 213 S. W. (2d) 116, 122.

■　After considering all of the evidence contained in the Wayside Bill of Exceptions, we have concluded, as did the trial court, that there was ample evidence on which the case should have gone to the jury on the question of causal connection, this being a question for the determination of the jury under proper instructions of the court.

Nor do we find any merit in the defendants' contention that even though they damaged the plaintiffs' dam, they would not be liable in the absence of negligent or excessive blasting, because they were entitled under the right-of-way deed to do such blasting as was reasonably necessary in the laying of the pipe line; that both blasting upon the right-of-way and probable damage to the plaintiffs' dam were contemplated by the parties at the time the Gas Company acquired the easement, and that the trial judge committed error by permitting the plaintiffs to testify regarding a conversation which they had with Gilliland, the Gas

Company's agent, prior to and at the time the deed was executed.

On the trial of the case Peltz was permitted to testify that when Gilliland first approached him about securing the right-of-way deed he told Gilliland that the dam had just been completed, and that Gilliland assured him that his Company would take care of that, and Peltz quoted Gilliland as saying: "I guarantee to you we won't destroy nothing for you"; that "The only thing that will be different we are going to cut the timber on the area, but the rest of it, we put the dirt back, level it up, and you can't tell the difference in it now and when we get through"; that after Gilliland's assurances that the dam would not be damaged by the construction of the pipe line he and his wife signed the deed, and he was paid the total sum of "$16.17" by Gilliland.

Objections were made by the defendants to the admissibility of the foregoing testimony on grounds that plaintiffs should not have been permitted to prove any representations made to induce them to sign the deed, other than those expressly set out therein, and that said express provisions must prevail over any previous or contradictory representations, because of the following provision in the deed:

"It is mutually understood and agreed that this right-of-way grant as originally written covers all the agreements and stipulations between the parties and that no representations or statements verbal or written have been made, modifying, adding to, or changing the terms of said original right-of-way agreement."

It appears that the deed to the right-of-way was prepared by the Gas Company's agent who took it to the

plaintiffs' home where it was signed by them. The deed refers to the land over which the pipe line would run as two tracts consisting of 40 and 50 acres each. Title to these tracts was held by the plaintiffs jointly as tenants by the entirety, and title to the 50 acre tract on which the dam was located was in the individual name of Mrs. Peltz. The deed to the right-of-way not only contains the same description as appeared in the original deeds to the two tracts, wherein they are described by metes and bounds, but goes farther and recites the names of the grantors from whom the land was purchased by plaintiffs. No reference appears in the right-of-way deed to either the dam or the 50 acre tract on which it was located, and it is obvious that the above provision upon which the defendants rely would not apply thereto but would apply only to the two tracts specifically described in the deed. This being the case, Peltz's testimony was not contradictory to the said provision, but was admissible to show that damage to the dam was not contemplated by the parties at the time the deed to the right-of-way was executed, and the defendants' plea of accord and satisfaction would be ineffective as to matters not appearing in the right-of-way deed. Furthermore, if the defendants secured the deed by representing to plaintiffs that no damage would result to the dam by the construction of the pipe line and damage did result therefrom, the plaintiffs could, as was done here, meet the defendants' plea of accord and satisfaction by a replication that the deed was obtained by fraud, whether the fraud be in the execution or in misrepresentation of material facts inducing execution, and the question of fraud would be for the determination of the jury. McDonald v. Scott County, 169 Tenn. 374, 87 S. W. (2d) 1019; Conrad v. Interstate Life & Acc. Ins. Co., 141 Tenn.

14, 206 S. W. 34; Memphis St. Ry. Co. v. Giardino, 116 Tenn. 368, 92 S. W. 855; Brundige v. Nashville C. & St. L. R., 112 Tenn. 526, 81 S. W. 1248.

■ Generally the consideration paid for a right-of-way easement or deed covers all damages to land which could have been recovered had such land been taken in a regular condemnation proceeding, and the plaintiffs would be bound thereby. Hord v. Holston River R. Co., 122 Tenn. 399, 123 S. W. 637; Knott v. Louisville & Nashville R. Co., 144 Tenn. 676, 234 S. W. 1003, 19 A.L.R. 482; Fuller v. City of Chattanooga, 22 Tenn. App. 110, 118 S. W. (2d) 886. But where a landowner suffers damage as a result of the condemnation and use of his land, which neither he nor the condemnor contemplated at the time of the condemnation proceedings, and the damage is of such nature that the court would have rejected an attempt to prove the same in the condemnation proceedings as speculative and conjectural, the landowner may be compensated for such damage in a subsequent action. Jones v. Oman, 28 Tenn. App. 1, 184 S. W. (2d) 568; Fuller v. City of Chattanooga, supra; 29 C.J.S., Eminent Domain, Sec. 328, p. 1372; 18 Am. Jur. 1011, Eminent Domain, Sec. 369.

■ In the instant case, it appears that if the plaintiffs had offered evidence as to the value of the dam as an element of damage in a condemnation suit, such evidence would have been properly rejected by the trial court as too speculative and remote; that being true plaintiffs should not be deprived of asserting their claim for damages in a subsequent action. Jones v. Oman, supra; Gossett v. Southern R. Co., 115 Tenn. 376, 89 S. W. 737, 1 L.R.A., N.S., 97; Aycock v. Nashville, Chattanooga & St. Louis Ry. Co., 4 Tenn. App. 655; Pate v. Lewisburg & Northern Railway Co., 8 Tenn. Civ. App. 335; City of Knoxville v. Peebles, 19 Tenn. App. 340, 87 S. W. (2d) 1022.

█ Nor do we think that the trial judge erred, as insisted, in submitting the case to the jury on the question of whether the blasting was negligent and excessive as charged under the first count of the declaration.

The undisputed evidence showed that the defendants knew of the existence of the dam and its location for some time prior to the blasting, but despite this fact they proceeded to set off at one time what was described as an unusually heavy charge for a distance of from 700 to 800 feet along the right-of-way. The evidence was also undisputed that the Oman Construction Company was in a hurry to get the work done, that its employees were instructed to "load heavy and shoot hard," and that the Company did not want to return for redrilling or reshooting. The trench dug for the pipe line extended to a depth of only 4 feet, and whether the defendants were negligent in setting off the entire charge in one blast when, as a matter of common knowledge, the same results could have been obtained by a series of smaller blasts set off at intervals, presented a jury question. The defendants were under a duty to exercise the highest degree of care possible, and whether the quantity of dynamite used and the methods applied in the blasting were reasonably necessary under the circumstances, were for the determination of the jury. Lackey v. Metropolitan Life Ins. Co., supra. See also 20 A.L.R. (2d) pages 1398, 1399.

█ █ The law is also well settled that the defendants were under a duty to remove the rock, debris, etc., cast upon the plaintiffs' property by the blasting and the clearing off of the right-of-way, within the shortest time possible and with the least injury to the land, and under the second count of the declaration it was a question for the jury to determine whether or not the defendants had breached this duty. Hord v. Holston River R. Co., supra.

Nor do we find any merit in the defendants' contention that the plaintiffs failed to prove either legal title or actual possession of the land on which the dam was constructed.

The plaintiffs introduced in evidence the orginal deed to the tract dated August 30, 1935, in which the plaintiff, Mrs. Peltz, was the named grantee, and the undisputed evidence showed that she and her husband thereafter took possession of the property, and in 1945 started construction thereon of the dam, and that they have been in continuous undisputed possession of the property since that time. Under our authorities either actual or constructive possession is sufficient to maintain trespass, and if the party is in actual possession under a deed, this is sufficient to maintain the action. Pepper v. Gainesboro Tel. Co., 1 Tenn. App. 175; Cathcart v. Malone, 33 Tenn. App. 93, 229 S. W. (2d) 157; Deaderick v. State, 122 Tenn. 222, 122 S. W. 975.

Having fully considered the assignment of error directed to the Wayside Bill of Exceptions and the questions raised thereunder we have concluded that this assignment is without merit, and it will be accordingly overruled.

We shall now proceed to consider the assignments of error directed to the second trial.

Under assignment 2, which is substantially the same as assignment 1, the defendants contend that there was no evidence to support the verdict of the jury, and that the trial court erred in refusing to sustain the defendants' motion for peremptory instructions made at the conclusion of all the evidence. While this assignment requires a review of all the evidence, such review is only to determine whether there is any substantial evidence

to support the verdict. In such review we are required to take the strongest legitimate view of all the evidence favorable to the plaintiffs, disregard all evidence to the contrary, and indulge all reasonable inferences to uphold the verdict. Jarratt v. Clinton, 34 Tenn. App. 670, 241 S. W. (2d) 941. And as a general rule where there is sufficient evidence on which a case should go to the jury, a verdict based thereon and approved by the trial judge will not be disturbed on appeal. Act-O-Lane Gas Service Co. v. Hall, supra.

■ Without material difference, the general tenor of the evidence introduced at both trials was substantially the same, also the matters relied upon in the first as well as this assignment, and having heretofore reviewed the evidence heard at the first trial at considerable length, a further review would not only be repetitious but unnecessary. Therefore, considering the evidence introduced at the second trial in the light of the foregoing rules, we find there was ample evidence to support the verdict of the jury and this assignment will be overruled.

■ Under proper assignments the defendants complain (1) that the verdict of the jury was excessive, and (2) because of the trial court's refusal to charge their Special Request No. 19, which was to the effect that the measure of damages to the dam was "the difference in value of the property immediately before and immediately.after the alleged damage," or the reasonable cost of repairing the damage, whichever was the lesser amount. The defendants offered no evidence as to the valuation of the property either before or after the dam was destroyed. Plaintiffs and their witnesses placed a valuation on the property at from $27,500 to $35,000 before and from $600 to $2,250 after the dam was destroyed. There

was no evidence offered by the defendants at the second trial as to the cost of repairing the dam, and in the absence of such evidence the defendants' request was properly refused, as a party is not entitled to an instruction on a theory not borne out by the evidence. Allen v. Melton, 20 Tenn. App. 387, 99 S. W. (2d) 219; Berryman v. Dilworth, 178 Tenn. 566, 160 S. W. (2d) 899.

The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial. Reeves v. Catignani, 157 Tenn. 173, 7 S. W. (2d) 38. See also Rose & Co. v. Snyder, 185 Tenn. 499, 206 S. W. (2d) 897; Foster & Creighton Co. v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222.

As previously pointed out, the trial judge ordered a remittitur of $4,450 on the overruling of the motion for a new trial, and we do not find anything in the record authorizing us to substitute our judgment for that of the jury and trial judge.

Next it is urged that the trial court committed error in excluding portions of the testimony of defendants' expert witnesses Rentenbach and Dr. Leet. These witnesses, after giving their opinions as to why the dam had failed, undertook to go farther and state as a fact that its failure was not due to the blasting but because of the faulty construction. We think the admissibility of this objectionable testimony would have invaded the province of the jury, the triers of fact, and that it was properly excluded. On this question the Court, in Cumberland Telephone & Telegraph Co. v. Peacher Mill Co., 129 Tenn. 374, 164 S. W. 1145, 1147, L.R.A. 1915 A, 1045 said:

"Generally speaking and without stopping to define exceptions, it may be said that where the cause

of an existing condition or injury is in dispute, and where the jury must determine which of the causes urged by the respective parties is the right one, an expert's opinion may be admitted to the effect that a certain cause could or might produce the condition; but to permit him to testify as to what in his opinion probably did it would be to supplant the jury by the witness.''

Next it is contended that the trial court erred in excluding the testimony of defendants' witness, Hugh Godwin, the essential portions of which are as follows:

''Q. Were you employed by the Oman Construction Company at the time the contract was entered into for the construction of the pipeline for the East Tennessee Natural Gas Company? A. Yes.

''Q. Who were the members of that partnership? A. John Oman, Jr., Stirton Oman and John Oman, III.

\* \* \* \* \* \*

''Q. What happened to that partnership, Mr. Godwin? A. Mr. John Oman, Jr., died about the 7th of November, 1949, and I presume—

\* \* \* \* \* \*

''J. Was there subsequently a new partnership formed? A. Yes.

''Q. What was that partnership? A. It was a partnership of Stirton Oman and John Oman, III.

''Q. Under what name? A. Oman Construction Company.

''Q. Did the partnership of Stirton Oman and John Oman, III, under the firm name of Oman Con-

struction Company, have anything to do with the construction of this Greenbrier to.Oak Ridge line?

\* \* \* \* \* \*

"A. As a new partnership they had nothing to do with it.

\* \* \* \* \* \*

"Q. Was it, the new partnership, in existence on September 21, 1949? A. No, sir.

\* \* \* \* \* \*

"Q. Was that partnership in existence at the time this suit was filed, which was—Let's see, what was the date?

"The Court: It was filed the 15th day of August, 1950.

\* \* \* \* \* \*

"Q. Was the two-man partnership in existence August 15, 1950? A. Yes, sir.
"Q. Was the two-man partnership in existence in the summer of 1949? A. No, sir.

\* \* \* \* \* \*

"Q. Did the new partnership take over all of the assets and liabilities of the old partnership?

\* \* \* \* \* \*

"A. I don't know."
It is argued that only the three-party partnership was in any way involved in this case, that the above testimony showed conclusively that the wrong partnership was sued, and that said testimony was admissible to show this fact; that one partnership cannot be held liable for the tort of another, even though some one or more individuals are members of both partnerships.

The rule is well settled that under the Uniform Partnership Law, partners are jointly and severally liable for matters growing out of wrongful acts of the partnership. Southgate v. Linton, 181 Tenn. 540, 181 S. W. (2d) 888; Code Secs. 7852, 7853, 7854; 68 C.J.S., Partnership, Secs. 270, p. 766; 40 Am. Jur. Sec. 316, p. 351.

The declaration specifically alleged that on September 21, 1949, "John Oman III and Stirton Oman, as general partners, operate under the name of Oman Construction Company, which partnership was operating at the time of the matters hereinafter complained of," and it clearly set forth the facts on which recovery was being sought. Nothing appeared in the declaration from which it could be inferred that the plaintiffs were seeking a recovery from any partnership other than the one in existence at the time of the alleged damages, and it appears that the defendant did not rely upon this defense in the first trial of the case.

Nor did the defendant plead specially the defense relied upon as required by Code Section 8767, which provides that "no matter of defense not pleaded shall be shown in evidence", the purpose of this section being " 'to enable a plaintiff to be forewarned of every matter of defense intended to be relied on by a defendant, and to require a defendant to make explicit all matters of defense which otherwise would be implicit in pleas of the general issue.' " [192 Tenn. 280, 241 S. W. (2d) 398.] Creekmore v. Woodard, 192 Tenn. 280, 241 S. W. (2d) 397; Provident Life & Accident Insurance Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251.

In Creekmore v. Woodard, supra, the Court said [192 Tenn. 280, 241 S. W. (2d) 399]:

"* * * when a defendant is ordered to plead

specially under Code Section 8767 the general issue plea is thereby abolished in so for as that suit is concerned, and he must plead specially not only every affirmative defense upon which he expects to rely, but likewise he must specially and expressly make denial of those substantive allegations of the declaration which he plans to deny as a part of his defense.''
Since the Oman Construction Company did not plead specially the matters relied upon as required by Code Section 8767, it follows that the trial court did not commit error in excluding the proffered testimony of Godwin.

Furthermore, it appears that the defendant from the beginning considered the action as against the partnership in existence at the time of the alleged damages, and having taken this particular position deliberately, it was required to act consistently throughout the litigation. Hamm v. Hamm, 30 Tenn. App. 122, 204 S. W. (2d) 113, 175 A.L.R. 523, Phoenix Ins. Co. v. Jordan, 28 Tenn. App. 11, 184 S. W. (2d) 721.

It is further contended that the trial court erred in refusing to grant a mistrial, because Peltz, while testifying, made the statement that in his conversation with Gilliland, the Company's agent, that Gilliland said: ''Mr. Peltz, you don't have to worry about the dam, * * *. In case something happens, *we have insurance,* we pay for it.'' (Italics supplied.)

It appears that immediately following Peltz's statement the jury was excluded from the court room, and in its absence the defendants made their motion for a mistrial which, after due argument, was overruled for the following reasons stated by the Court:

''In an ordinary case where insurance is mentioned, and brought in by the plaintiff, I would sustain the

motion for a mistrial, I would do it, I would do it in a minute. I am not doing it because sitting here listening to this evidence myself, I did not know he used the word 'insurance' at all. The lawyers on this side, and the stenographers say they did. Possibly the jurors did, too. I am sitting close to this man, and I did not get any idea of insurance at all. So I feel like the jury did not get that information. He speaks a broken English, however, and about two-thirds of what he said I did not understand, and I do not feel that the jury did.

"Perhaps, if the jury heard all of the answer as read and argued, if they gained that information, I think perhaps the Judge in his discretion, ought to grant a mistrial. I would do it, except for the fact of sitting here and hearing him, and I did not get the impression of insurance. The jury might have got it just like these stenographers did. I don't see how. I think perhaps they sort of acquired a knowledge about something, but I don't think—I thought possibly I would call these jurors up here and ask them about it, one by one. That was on my mind. And I thought possibly it might only aggravate the case. I thought perhaps the jury sitting here, just as I did —I got the high points in this particular case, but I did not hear anything about insurance at all, so I turned and asked the stenographers when the argument came up, what he said.

"So, I will refuse it.

"I do not think old man Peltz intended this at all, intentionally. I can't get that in my head. Of course, if I felt that he did, I would enter a mistrial in this case right off the reel, but I cannot get that in my

head. He just went on, and you say a thing wasn't said, and he says it was. And that is the way it is.

"I realize, as I have said, that this is a close case. If I felt like the jury got the full force or import of what this fellow said, it is a question in my mind, if I would not now enter a mistrial. But if I go to asking them about it, it precludes the idea of not doing it. So, I will do this. I will overrule the motion, and give you the benefit of your exception."

On overruling the defendants' motion for a mistrial, it appears that the trial judge saw fit not to instruct the jury to disregard Peltz's statement, though he agreed to do so if requested by the defendants, because as stated he did not hear the remark and apparently did not want to inject into the case something the jury in all probability had not heard. That the trial judge was correct in his observation and exercised sound discretion in dealing with the question, will hereinafter appear. However, in his general charge, the trial judge gave the following specific instruction:

"The question of insurance has no place in this lawsuit and if any mention of that should be made by any witness, you will disregard that, don't consider it on the trial of this case, it has no place whatever in the consideration of this case."

On defendants' motion for a new trial in which Peltz's reference to insurance was relied upon as one of the grounds, the plaintiffs procured and filed the affidavits of all twelve of the jurors who sat on the case. In these affidavits each of the jurors stated that he did not hear Peltz's remark about insurance, and that the word "insurance" was not mentioned in the jury's deliberations in

reaching the verdict. Thus it appears from the affidavits of the twelve jurors that the remark complained of had no bearing on the outcome of the case, and the alleged error, if such, was harmless and did not affect the results of the trial. Code Sec. 10654.

Furthermore, at the conclusion of the argument on the motion for a mistrial, the trial judge stated that he would specifically charge the jury at that time to disregard any mention of insurance, if counsel for either party desired such a charge. No request was made, and the defendants thereby waived any right to rely upon any error in this respect. Under the circumstances if there was any error it was invited or condoned by the defendants. Norris v. Richards, 193 Tenn. 450, 246 S. W. (2d) 81; Gardner v. Burke, 28 Tenn. App. 119, 187 S. W. (2d) 25; Gentry v. Betty Lou Bakeries, 171 Tenn. 20, 100 S. W. (2d) 230; Bealafelt v. Hicks, 13 Tenn. App. 18; 5 C.J.S., Appeal and Error, Sec. 1501, p. 173.

Finally, under numerous assignments, the defendants complain (1) of portions of the trial court's charge, and (2) because the court refused to charge several special requests. After carefully considering the portions of the charge complained of in the light of the court's general charge, we find no error therein that would justify a reversal of the case. The entire charge of the court, which covered more than 27 pages of the record, was clear and comprehensive, and all the requests which should have been granted were adequately covered.

Besides, our appellate courts are not permitted to reverse for error unless it shall affirmatively appear that the error complained of affected the results of the trial. Code Sec. 10654.

It results that all assignments of error will be overruled and the judgment below will be affirmed at defendants' costs.

McAmis, P. J., and Hale, J., concur.