IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 11, 2020 Session

**MITZI SUE GARNER v. ROBERT ALLEN GARNER**

**Appeal from the Circuit Court for Hamilton County**
**No. 09D1210     L. Marie Williams, Judge**

_____

**No. E2019-01420-COA-R3-CV**

_____

This appeal arises from a long-running divorce case.  In 2009, Mitzi Sue Garner ("Wife") sued Robert Allen Garner ("Husband") for divorce in the Circuit Court for Hamilton County ("the Trial Court").  The matter was tried in 2010.  An appeal to this Court was dismissed in 2012 for lack of a final order.  In 2019, a final order at last was entered. Husband appeals.  Husband raises several issues, including whether the Trial Court erred in its valuation of certain marital property, in determining his income for purposes of child support and temporary alimony, as well as in granting Wife an award of transitional alimony to secure certain marital debts assigned to Husband.  We discern no reversible error.  However, we modify the Trial Court's characterization of Husband's marital debt obligations from transitional alimony to alimony in solido.  We affirm the judgment of the Trial Court as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

W. Neil Thomas, III, Chattanooga, Tennessee, for the appellant, Robert Allen Garner.

Mitzi Sue Garner, pro se appellee.

# OPINION

## Background

Wife and Husband married in 1977. Two children ("the Children") were born of the marriage—one in 1994, the other in 1999.[1] Wife worked at a veterinary clinic. Husband ran a gym that he co-owned with Wife.

In June 2009, Wife sued Husband for divorce in the Trial Court. In September 2009, Wife filed a motion for alimony and child support pendente lite. Wife submitted an affidavit asserting that Husband earned $7,301 per month before taxes. In addition, Wife filed an income and expense statement reflecting her gross monthly income of $2,400—$2,128.14 net—and monthly expenses of $4,798.82. In October 2009, the Trial Court entered an order awarding Wife $1,501 per month in temporary child support and $1,169.68 per month in temporary alimony. The Trial Court also adopted Wife's permanent parenting plan.

Husband filed an answer and counterclaim for divorce. Husband also filed a motion seeking to overturn the Trial Court's order on the permanent parenting plan and temporary support in which he stated, in part, that "[t]he Affidavit attached to [Wife's] Motion fraudulently misstates [Husband's] income." In October 2009, the Trial Court entered an order denying Husband's motion but stating that "[a]t the trial of this matter, the Court may consider a retroactive modification of the Defendant's obligation of temporary child and/or spousal support by either an increase or decrease of such obligation."

Trial was held in October and November of 2010. Wife retained counsel, while Husband represented himself. The testimony of particular relevance to the issues on appeal centered on the parties' respective incomes and the value of Garner's Gym. Wife testified as follows regarding Husband's income from the business:

> Q. Were you previously involved in the books and records of the gym before you and your husband separated?
> A. When it was time to do the taxes -- I was never involved with money that came in or how Bob spent the money at the gym. That was his business. He did not want me to have a part of that. Now, when it come time to doing taxes, I was able to do the taxes at the beginning and then I got where I was getting uncomfortable with it. Bob would bring me a bag or a box full of receipts and I would have to go through those receipts and separate what was

---

[1] Although income for child support purposes is at issue on appeal, parenting issues are not as both of the Children have long since reached majority age. Therefore, we will not revisit the parties' disputes over parenting issues. We instead focus on the financial aspects of the case in our recitation of the facts.

gym, what was personal, and come with up our expenditures. The last time that I did the tax return Bob had typed up what was the expenditures and told me to figure out the taxes.

Q. Have you undertaken an analysis or some type of accounting with regard to the business for 2010?

A. Yes. I asked Bob to provide the bank statements for the gym, to provide his bank statements, and so he did through you asking him to provide them. I went through and broke them down as much as I could as far as categories as far as person or miscellaneous and as far as gas, eating out, gym expenses, unknown checks, deposits, and things like that.

Q. Is this the analysis prepared by you?

A. Yes.

MR. NORTH: If we could mark that as the next exhibit. (Whereupon, the document was marked as Exhibit No. 13 to the testimony of Mitzi Garner and filed under separate cover.)

Q. (By Mr. North) Does your husband routinely deal in cash transactions with regard to the business?

A. On Parents Night Out most of the time he deals in cash.

Q. Okay. Explain to the Court what Parents Night Out is.

A. Parents Night Out is on Friday and Saturday nights. The parents would bring the children. It's kind of like a baby-sitting service so that they can go out and go to movies or eat out. We would watch the children from 7:00 until 11:00 at a cost of $10. At first they were taking some checks, but then we were having people bounce checks for $10, so he decided he would only do cash for Parents Night Out. It would bring in anywhere from 2,000 to $4,000 a month.

Q. Two to four thousand dollars per month?

A. Yes.

Q. Are there any Parents Night Out receipts to your knowledge included in this analysis that you have done?

A. No.

Q. And based upon your review you determined that exclusive of the Parents Night Out cash receipts, the total year-to-date income for the business has been $57,790.32?

A. That was the deposits that's listed in the bank statements that he gave me. Bob also does privates and he also does -- he can do privates and birthday parties and things like that which I have no idea how much he brought in for those services.

Q. What are privates?

A. Privates is where he has an individual to come in and he works with them one-on-one.

-3-

Q. Did your husband provide you any records with regard to deposits of cash?
A. No.
Q. Did your husband provide you any records concerning any cash transactions?
A. No. He told me that he would not provide that when I went down there.
Q. And your recap is -- you break it down monthly as well, do you not?
A. I break it down monthly.
Q. Did you find that there were personal items paid through the business?
A. Yes.

On cross-examination, Husband asked Wife about her testimony concerning his income being higher than reflected in the tax returns:

Q. I would like you to look at that as the 2007 tax return that we filed jointly which is our last tax return that we filed jointly, and did you, in fact, sign that?
A. Yes, I did.
Q. What does the income show on that document as my income being?
A. $72,121.
Q. No, ma'am. I'm asking what my income is, not the receipts of the gym. What is it showing as my income?
A. That was your income.
Q. No. What is it -- say that again.
THE COURT: Don't argue with her. Accept her answer and then you may testify if you believe it to show something different. The document speaks for itself anyway.
Q. Were you, in fact, up until that point or up until I left the tax preparer at the gym as you had testified earlier?
A. I did prepare the taxes. I also told you after we bought the gym that I didn't feel comfortable preparing them anymore.
Q. Well, I mean you prepared them up until 2007, correct?
A. Yes, I did.
Q. And then after that I moved out. So on those two documents -- on one document you're testifying that it is $7,301 a month and on the other document that you signed you're showing that the income was much less than that. I'm just curious as to which one is correct?
A. I don't have a calculator. If I had a calculator, I could divide it and see.
Q. Well, my question is, it appears as though on one document that you filed an affidavit with the Court showing an $87,000 income of mine to the Court and on the other document it appears as though you have made an allegation

to the federal government that my income was 14,000. I'm just wondering at which point is correct?

A. Sir, your income fluctuates. When I came up with the income up there, it was the '08 tax return that I figured that document on, not the '07.

Wife testified that Garner's Gym was worth $650,000. For his part, Husband attempted to put on Lawrence Day ("Mr. Day"), the person who in 2006 had sold him the gym for $405,000, to testify. Mr. Day, who financed the sale, held the mortgage on Garner's Gym. However, the Trial Court did not allow Mr. Day to testify without his being qualified as an expert. The following exchange occurred:

THE COURT: (Interposing) Mr. Day is the owner of the property?

MR. NORTH: He is the mortgage holder.

THE COURT: So he is the owner of the property?

MR. NORTH: Well --

THE COURT: (Interposing) He holds the -- well, yeah, that's true.

A. Technically --

THE COURT: (Interposing) Whose name is the property titled in now? Is it titled in your name now?

A. In our names.

THE COURT: In your names together, okay.

A. Mr. Day is financing it to us.

THE COURT: Okay. Well, unless he is qualified as an expert he can't give an opinion on value.

MR. NORTH: And we will stipulate again the amount of the debt.

A. How do we qualify him as an expert? Who would be more an expert than the man that sold the property to me?

THE COURT: I can't practice law for you, Mr. Garner.

Husband moved on. At the next day of trial, Husband asked Wife how she arrived at her value for Garner's Gym:

Q. Now, the figures that we have down here, the 99,000 for the house and 650,000 for the gym, how did you come up with those figures?

A. I'm sorry, say it again.

Q. You listed 99,000 as the value of the house and 650,000 as the value of the gym. I am just curious as to how you came up with those figures.

A. When I looked up the property taxes, that's the value of the house.

MR. GARNER: Your Honor, I would like to introduce this tax document for the year 2009.

THE COURT: Show it to Mr. North.

MR. NORTH: Your Honor, in and of itself the tax appraisal is not admissible to show value.

MR. GARNER; My purpose is that she -- her allegation was that that's how she came up with the figure and I would just like to show the Court the assessment that Hamilton County actually showed.

MR. NORTH: It's certainly hearsay.

THE COURT: This document is hearsay and it is not admissible.

MR. GARNER: So anything from the Hamilton County courthouse -- I mean the Assessor's Office is not considered validity to show --

THE COURT: There are certain proper ways of introducing evidence and just handing documents in is not it. They have to be authenticated and not within the hearsay rule -- they have to be within the hearsay exception.

MR. NORTH: Your Honor, to facilitate the proof, if I could perhaps provide to Mr. Garner, this is the case of Carpenter vs. Sims from the Court of Appeals in 2008 which indicates that the property tax appraisal is not competent and is not admissible to prove value.

MR. GARNER: Well, that's not what my point was. My point was that Mrs. Garner had claimed that that's how she came up with the figure of 650,000 and I was just going to show the document, but that's fine.

Q. (By Mr. Garner) So other than that you have no proof at all that the value of the property would be 650,000?

A. I know when Mr. Day sold us the property that it was worth almost 200,000 more than what we paid.

Q. And where do you come up with that at?

A. I came up with that from listening to you and Mr. Day talk.

Q. The property was bought at 405,000 and we have done some checking -- I mean there's no way that it would sell for -- I guess this is not --

THE COURT: (Interposing) Sir, it's your time to question her, not to testify.

Q. Okay. So other than -- I mean you have no hard evidence to prove that the value of the property is 650,000, is that correct?

A. I have no hard evidence.

In November 2010, the Trial Court entered its memorandum opinion. The Trial Court found, in part:

This cause is before the Court for the divorce of the parties and all attendant issues. The Court finds this is a marriage of 23 years duration[2] and two children were born of the marriage…. The Court finds the parties have

---

[2] Elsewhere, the record reflects that the parties were married in 1977, which would make theirs a marriage of some 33 years rather than 23 years.

had a somewhat tumultuous marriage through the years. There were times early in the marriage where there appeared to be a strong marital tie. However, that dynamic changed over the years. The parties were involved in a gymnastics business for many years. The business was the primary source of income of the parties for most of the marriage. At the time of trial, the business was the sole source of income for defendant Robert Garner; whereas, plaintiff Mitzi Garner was employed outside the home working for a veterinarian office.

The parties stipulate the divorce shall be granted. The remaining issues are all parenting issues, the division of assets and liabilities, a contention Mr. Garner is in civil contempt as he is in arrears $31,000.00 in alimony and Mr. Garner seeks a retroactive modification of alimony and child support.

The Court first will address the division of the assets and liabilities and in doing so is guided by T.C.A. 36-4-121. The Court finds all personal and real property to be marital in nature. The Court finds this is a marriage of 23 years duration and the age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities, and financial needs of each of the parties are substantially comparable.

There is no proof of contributions made by one party to the education, training, or increased earning power of the other. The ability of each party for future acquisitions of capital assets and income is substantially equal. Both parties contributed to the acquisition of the marital estate. Neither party had an estate of significance at the time of the marriage and neither party has separate property now. No tax consequences have been proved. The economic circumstances of the parties will be impacted by this division.

The Court values and divides the property as follows:

**Assets Awarded to [Wife]**:

[the marital residence], Hixson, TN $99.000.00
2[]005 Ford Explorer $11,800.00
Health Savings Account $1,200.00
Jewelry $200.00
Household Furnishings $1,800.00
Plaintiff's Checking Acct. - First Tennessee $100.00

Total Assets to [Wife] $114,000.00

**Liabilities Assessed to [Wife]**:

Wells Fargo (1st mortgage) $30,542.00
Attorney's Fees (Newkirk) $4,231.56
Attorney's Fees (CB&S) $12,000.00

Total Liabilities to [Wife] $46,773.56

Net to [Wife] $67,226.44

**Assets Awarded to [Husband]**:

Defendant's Checking Account
Garner's Gym, including contents $565,000.00

Total Assets to [Husband] $565,000.00

**Liabilities Assessed to [Husband]**:

Regions Bank (2nd mortgage) $17,557.47
Bank of America $10,958.00
Comcast $596.00
Ford Credit (Explorer) $4,314.36
Target $1,307.00
Sam's Club $1,231.00
Sears $8,760.00
Beneficial Tennessee $31,967.98
Garner's Gym $405,000.00

Total Liabilities to [Husband] $481,691.81

Net to [Husband] $83,308.19

***

Both parties have some credibility issues. Mrs. Garner's perception of Mr. Garner and his conduct and relationships with the children are colored by his betrayals of her and the marital relationship. Mr. Garner's credibility is impacted by his inability to perceive accurately the consequences of his conduct and his righteous belief he is always right.

The parties' credibility is comparable. The children provided the most objective testimony. The Court finds the children testified honestly and with great love for both parents.

***

The Court finds the income of Mr. Garner is not fully represented by his 2009 tax return which is Exhibit 1 and that his income for prior years has been greater than that reflected on the 2009 tax return. The Court finds credible the testimony that approximately $3,000.00 a month is generated in cash from activities not reflected on the tax return. Additionally, the Court has no documentation of the $6,000.00 supply figure found at line 22 of Schedule C or the entry at line 42 of $6,496.00 for cost of goods sold. Accordingly, the Court cannot determine whether or not these are factors properly considered as income for purposes of calculation of child support. Further, the Court finds credible the testimony that business income was used by Mr. Garner for personal reasons. The income reflected as the adjusted gross income on Exhibit 21 is inconsistent with the lifestyle led by Mr. Garner. Accordingly, the Court finds the income of Mr. Garner for child support and alimony purposes to be $55,000.00 per year. The Court finds this is his current income and historically [h]is income has been greater. Accordingly, the modification of child support and alimony will not be retroactive. The Court also notes it has no documentation of Mr. Garner's 2010 income.

The Court finds the income of Mrs. Garner for child support purposes is $2,400.00 per month.

(Footnote added).

Wife filed a motion to alter or amend, as did Husband. In February 2011, the Trial Court entered its purported final decree of divorce, incorporating its November 2010 memorandum opinion. Husband's gross monthly income was set at $4,583, and Wife's was $2,400, with Husband ordered to pay Wife $595 per month in child support.

In March 2011, Husband filed a motion to alter or amend the final decree of divorce, as did Wife. Of particular note, Wife sought to reclassify marital debt assigned to Husband as alimony. The Trial Court entered an order ruling on these motions, stating in relevant part:

Defendant Garner objects to the division of the assets and liabilities and the valuation placed on the Garners' gym. Plaintiff Mitzi Garner contends the Court should clarify the division of assets and liabilities to demonstrate the obligations imposed on Mr. Garner are in the nature of support. T.C.A. 36-5-121 addresses support of spouses. In determining whether or not to award alimony, the Court first must address the need of the

-9-

person seeking support and the ability to pay of the person who is to pay support. The Court has already determined the ability to pay of Mr. Garner in its findings concerning income and the equitable division of assets and liabilities. The Court reiterates that division is equitable. However, were Mr. Garner to not pay the obligations imposed upon him by the Court, thereby having those obligations default to Mrs. Garner, the division would not be equitable and she would not have the means to support herself. The Court further finds Mr. Garner has the greater earning capacity than does Mrs. Garner. The relative educations and trainings of the parties are comparable. This is a marriage of 23 years duration. All other factors are comparable with the exception that the provisions made with regard to marital property would have an impact on the alimony need were Mr. Garner not to pay them. Accordingly, the Court finds the debt imposed upon Mr. Garner is in the nature of transitional alimony. It shall not terminate upon the death of the payor. The Final Decree is so altered and amended.

Plaintiff Mitzi Garner contends the time set by the Court for payment of past-due child support is unreasonable. In light of the other obligations imposed by Mr. Garner and the fact that interest runs on the child support arrearage judgment and the spousal support judgment, the Court finds the schedule not unreasonable. The running of interest gives Mr. Garner every incentive to pay in a more expedient manner. This motion is overruled

The Court finds the request of Mitzi Garner that she be permitted to claim both children as dependents for the tax year 2010 as Mr. Garner provided minimal support for the benefit of the children during that year valid. Accordingly, the Motion to Alter or Amend to award to Mrs. Garner the tax exemption for both children for the year 2010 only is sustained. Mr. Garner's motion on that same subject is overruled as is Mr. Garner's contention the Court incorrectly calculated his income.

Mr. Garner contends the number of days is not calculated correctly. The Court orally ordered the parties to meet to obtain a resolution of this issue. They are ORDERED to do so within fifteen (15) days of entry of this Order and report to the Court whether or not it needs to address this last issue.

In all other aspects, the Motions to Alter or Amend are overruled.

Husband appealed to this Court. We dismissed Husband's appeal for lack of a final order because the Trial Court's March 2011 order left unresolved the calculation of parenting days. *Garner v. Garner*, No. E2011-01012-COA-R3-CV, 2012 WL 1143781, at *3 (Tenn. Ct. App. April 5, 2012). Additional procedural matters in the case unfolded.

In August 2012, Wife filed a petition for civil contempt against Husband, asserting that "Defendant willfully violated this Court's February 23, 2011 and March 24, 2011

order, which required Defendant to pay Plaintiff monthly child support, monthly arrearage child support and spousal support and to pay certain liabilities." In October 2012, Husband filed a response, stating in part that "[b]ased upon the actual residential time each of the children have had with the Plaintiff and the Defendant, the Defendant is not obligated for child support and may be due a nominal sum per month from the Plaintiff," and: "Unfortunately, the parties did incur debt during the marriage which neither can repay based upon their relative incomes. That is the reason the Defendant filed bankruptcy and received a discharge. The Court's amendment of its Final Decree to characterize these obligations as transitional alimony poses obligations upon the Defendant which he cannot pay."

In August 2014, Husband filed a motion for entry of final decree of divorce concerning calculation of parenting days, in which Husband asserted: "[T]he Defendant would submit that in accordance with the Opinion from the Court of Appeals filed April 5, 2012, this Honorable Court's Order dated March 24, 2011 was not a final Order since the parenting time arrangement and/or calculations remained in the bosom of the trial court . . . . the Defendant respectfully submits that a Final Decree of Divorce needs to be entered in this matter specifically stating the number of days for each parent's parenting time in accordance with this Honorable Court's prior rulings." The case then went inactive for years until Wife obtained a judgment for arrearages against Husband, after which Husband again pointed out that no final order had been entered.

In July 2019, the Trial Court at last entered a final order. In it, the Trial Court determined the parties' respective parenting days and accordingly reduced Husband's child support to $241.00 per month. Husband timely appealed to this Court.

## Discussion

Although not stated exactly as such, Husband raises the following issues on appeal: 1) whether the Trial Court erred in valuing Garner's Gym and excluding Mr. Day's testimony; 2) whether the Trial Court erred in changing a debt liability of Husband's to transitional alimony with no fixed period for payment; 3) whether the Trial Court erred in its determination of Husband's income for purposes of temporary alimony and permanent child support; and, 4) whether the Trial Court erred in declining to make a retroactive recalculation of temporary alimony and child support. Wife, pro se, raises a separate issue related to Husband's delay and avoidance of the Trial Court's Orders.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no

presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. ––––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). Insofar as the issues on appeal implicate the abuse of discretion standard, "[a]n abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

We begin by addressing Wife's separate issue, which we quote: "Should the Husband have been allowed to manipulate and avoid the Courts Orders for eight years and cause undue financial burden and stress upon the Wife without some form of consequence?" Respectfully, it is unclear exactly what Wife would like us to do. Her issue—if it may be regarded as an issue—fails to articulate a specific legal question for resolution. In that sense, we are unable to afford Wife any relief. We can, however, decide this appeal, which we will proceed to do.

Our review of Husband's issues begins with whether the Trial Court erred in valuing Garner's Gym and excluding Mr. Day's testimony.[3] Wife testified that Garner's Gym was

---

[3] Husband's brief lacks a table of property conforming to the requirements of Rule 7 of the Rules of the Tennessee Court of Appeals. Husband did, however, include in his "statement of the evidence" section a list showing how the Trial Court divided the marital property. We will consider this issue, but warn that

worth $650,000. Wife testified that she based this figure on her review of the tax assessor's appraisal, as well as what she had overheard Husband and Mr. Day say to one another regarding the property being worth $200,000 more than it was sold for. When Husband attempted to put Mr. Day on to testify to a value, he was denied. Husband also was denied the opportunity to cross-examine wife as to the tax appraisal. On appeal, Husband asserts that the only competent evidence of the gym's value was the $405,000 purchase price. The Trial Court ultimately valued Garner's Gym at $565,000. On appeal, Husband argues that (1) he should have been allowed to call Mr. Day, who held the mortgage on the property, and (2) he should have been allowed to cross-examine Wife as to the tax appraisal.

As this Court has stated regarding competent valuation evidence:

> It is generally held that the owner of property is considered competent to testify regarding the value of the property. *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 943 (Tenn. 1977); *Haynes v. Cumberland Builders, Inc.*, 565 S.W.2d 887, 888 (Tenn. Ct. App. 1978). In this case, the husband has not been the owner of the property for twelve years. He relies on *Wall v. Thalco, Inc.*, 614 S.W.2d 803 (Tenn. Ct. App. 1981) for the proposition that the previous owner of property is competent to testify to establish the value of the property. In *Wall*, the previous owner had conveyed the property to the record owner to enable the record owner to obtain a loan. The record owner was contractually obligated to remove the lien and reconvey the previous property to the previous owner. In addition, the previous owner demonstrated sufficient knowledge regarding the value of the property since he had observed test drilling on the property. A lay witness testifying on value must demonstrate sufficient knowledge to the satisfaction of the trial court and must also state the facts upon which he bases his opinion. *Montana Ry. Co. v. Warren*, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890); *Hill v. U.S. Life Title Ins. Co.*, 731 S.W.2d 910, 914 (Tenn. Ct. App. 1986). No offer of proof was made and, consequently, the evidence is not in the record. Thus, any assignment of error based on exclusion of that proof must be overruled. *Valentine v. Conchemco, Inc.*, 588 S.W.2d 871, 876 (Tenn. Ct. App. 1979).

*Johnson v. Johnson*, 1989 WL 105654, at *3 (Tenn. Ct. App. Sept. 13, 1989), *no appl. perm. appeal filed*.

Thus, as a co-owner, Wife was able to opine as to a value of Garner's Gym, and she did. Mr. Day was the mortgage holder, not an owner, as such. Moreover, Husband did not

noncompliance with Rule 7 may result in waiver of property-related issues in an appeal arising from a divorce.

make an offer of proof as to Mr. Day's testimony. As a co-owner, Husband could have testified to his own opinion of value, but he declined. Even if it was error to exclude Mr. Day's testimony, there was no offer of proof and this evidence is not in the record. Husband's argument on this part of the issue is without merit.

Even still, Husband has a valid point in that the Trial Court should have allowed him to cross-examine Wife on the tax appraisal since she testified that it was partially the basis for her opinion. However, not every error committed by a trial court constitutes reversible error. As a co-owner, Wife could opine as to a value of the gym. She did not need to rely on a tax appraisal, nor was the Trial Court bound by Wife's opinion of value. The Trial Court chose a figure, $565,000, which was between that on the low end asserted by Husband on appeal, the purchase price of $405,000, and the figure on the high end testified to by Wife, $650,000. This value of $565,000 included not just the Garner's Gym property but also the contents of Garner's Gym. We find no error in the Trial Court's adoption of a value within the range of values presented to it. We affirm as to this issue.

We next address whether the Trial Court erred in changing a debt liability assigned to Husband to transitional alimony with no fixed period for payment. Trial courts have broad discretion in determining alimony. *Gonsewski*, 350 S.W.3d at 105. Husband asserts that no determinative period of time was provided by the Trial Court as required by statute, and no finding of a necessity of assistance was made to support the award. Transitional alimony is defined as follows:

> (g)(1) Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.
> (2) Transitional alimony shall be nonmodifiable unless:
> (A) The parties otherwise agree in an agreement incorporated into the initial decree of divorce or legal separation, or order of protection;
> (B) The court otherwise orders in the initial decree of divorce, legal separation or order of protection; or
> (C) The alimony recipient lives with a third person, in which case a rebuttable presumption is raised that:
> (i) The third person is contributing to the support of the alimony recipient and the alimony recipient does not need the amount of support previously awarded, and the court should suspend all or part of the alimony obligation of the former spouse; or

(ii) The third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded and the court should suspend all or part of the alimony obligation of the former spouse.

(3) Transitional alimony shall terminate upon the death of the recipient. Transitional alimony shall also terminate upon the death of the payor, unless otherwise specifically stated in the decree.

(4) The court may provide, at the time of entry of the order to pay transitional alimony, that the transitional alimony shall terminate upon the occurrence of other conditions, including, but not limited to, the remarriage of the party receiving transitional alimony.

Tenn. Code Ann. § 36-5-121(g) (2017).

Indeed, the lack of a determinative period goes against the statute's transitional alimony requirements. However, we disagree with Husband that the solution is to reverse this award. In its order on the parties' motions to alter or amend, the Trial Court referred to its findings as to Wife's need and Husband's ability to pay. The Trial Court found further that Wife would lack the means to support herself should Husband fail to pay the debts assigned to him, thus the impetus for classifying the debt as alimony. The evidence does not preponderate against those findings. While transitional alimony may not have been the appropriate species of alimony to use here, there is another species of alimony that more closely fits the bill. Alimony in solido is defined as:

(h)(1) Alimony in solido, also known as lump sum alimony, is a form of long term support, the total amount of which is calculable on the date the decree is entered, but which is not designated as transitional alimony. Alimony in solido may be paid in installments; provided, that the payments are ordered over a definite period of time and the sum of the alimony to be paid is ascertainable when awarded. The purpose of this form of alimony is to provide financial support to a spouse. In addition, alimony in solido may include attorney fees, where appropriate.

(2) A final award of alimony in solido is not modifiable, except by agreement of the parties only.

(3) Alimony in solido is not terminable upon the death or remarriage of the recipient or the payor.

Tenn. Code Ann. § 36-5-121(h) (2017). We conclude that Husband's alimony obligation is better characterized as alimony in solido. The statute requires that if the alimony in solido is to be paid in installments, the payments must be "ordered over a definite period of time . . . ." Here, the Trial Court did not order the alimony to be paid in installments,

-15-

and therefore, the "definite period of time" provision does not come into play. We, therefore, modify the Trial Court's judgment to reflect that Husband's debt obligations are in the nature of alimony in solido rather than transitional alimony. Our recharacterization of the alimony does nothing to change Husband's obligation, which remains court-ordered alimony that he must pay if he has not already.

We next address whether the Trial Court erred in its determination of Husband's income for purposes of temporary alimony and permanent child support. Husband argues that the Trial Court should have relied on his tax returns to arrive at his actual income. He disputes the figure of $55,000 per year chosen by the Trial Court. However, courts are not obliged to accept tax returns at face value. With respect to what sort of evidence courts may rely upon in establishing a parent's income for child support purposes, we have discussed as follows:

> The guidelines provide that "reliable evidence of income" may include "tax returns for prior years, check stubs, or other information" for determining the parent's ability to support. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(I)(I). However, "[t]his is neither an exclusive list nor is it an absolute bar to the court's consideration of testimony." *Garrett*, 2014 WL 3763806, at \*9. Of course, the court may choose to disbelieve a parent's proof relative to his or her finances and deem it unreliable, even if it is the type of evidence listed in the guideline. *See, e.g., Miller v. Welch*, 340 S.W.3d 708, 714 (Tenn. Ct. App. 2010) ("If Father's evidence as to his income is not accurate, then it is not reliable."). A parent's reported income may not truly reflect his or her ability to provide support. *Eatherly*, 2001 WL 468665, at \*4. The guideline expressly provides that "other information" aside from tax returns or check stubs may be used as reliable evidence insofar as it allows the court to determine the parent's ability to support. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(I)(I). *See, e.g., Massey*, 315 S.W.3d at 794 (affirming the trial court's decision to disregard tax returns and check stubs and set income based on a substantially larger income figure stated in the parent's mortgage application); *Parris v. Parris*, No. M2006-02068-COA-R3-CV, 2007 WL 2713723, at \*11 (Tenn. Ct. App. Sept. 18, 2007) (affirming an allocation of $149,228 in income based on a review of business checking account deposits and expenses even though the parent's tax returns claimed zero net income); *McDaniel v. McDaniel*, No. W2007-01587-COA-R3-CV, 2008 WL 5263605, at \*7-8 (Tenn. Ct. App. Dec. 18, 2008) (involving income set solely based on the parent's testimony); *Brewer v. Brewer*, No. M2005-02844-COA-R3-CV, 2007 WL 3005346, at \*10 (Tenn. Ct. App. Oct. 15, 2007) (concluding that a retirement account statement was reliable evidence of income).

*In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *14 (Tenn. Ct. App. Feb. 23, 2018), *no appl. perm. appeal filed*.

We believe this analysis extends to alimony determinations, as well. Tax returns may be useful evidence, but they are not necessarily the final word on a party's income. Although the Trial Court found the parties to be comparable in their credibility, the Trial Court clearly did not accept Husband's tax returns at face value. The Trial Court credited Wife's testimony that Husband used business income for personal use. The Trial Court saw and heard the witnesses testify. There is no evidence in this record of the clear and convincing sort that would cause us to overturn the Trial Court's determinations on witness credibility, and specifically here as to Husband's personal use of business income. We affirm the Trial Court in its determination of Husband's annual income.

In subparts to this same issue, Husband contends that the Trial Court erred in determining that Wife's income was $2,400 per month, the amount she claimed in her statement of income and expenses. Husband points to a paystub, an exhibit 15 in the record, from which he asserts that Wife's income can be calculated from August year-to-date as $2,836 per month. In her brief, Wife states that the $2,400 figure was accurate at the time she claimed it, but that she had since gotten a raise. We have reviewed the paystub for a later time period, and find that it is not so conclusive on its face as to require reversal of the Trial Court's determination of $2,400 per month.

Husband contends also that there is no basis in the record for the Trial Court to have granted Wife a $480 credit for health insurance. At trial, Wife testified as follows regarding health insurance costs:

> Q. What is your insurance cost, which of those items?
> A. My kids are covered in everything I've got on them as far as the insurance and Bob as well. I'm asking Bob to help me cover the children as far as their dental –
> Q. (Interposing) I understand, but what is the specific cost that we are talking about?
> A. The specific cost is 319.65 and 31.98 and that's every other week.
> MR. NORTH: If we could mark that as the next exhibit.
> (Whereupon, the document was marked as Exhibit No. 15 to the testimony of Mitzi Garner and filed under separate cover.)

Husband states in his brief: "The court credited the Wife with a monthly health insurance premium of $480 (Mem. Worksheet, p. 2) Although the record does support a monthly premium payment of $618.40 for a family of four (Tr., p. 35), one-half that amount for the children should have been $380.93, not $480.00." This issue again involves exhibit 15,

-17-

Wife's paystub. We note that the paystub reflects deductions in that pay period of $568.26 for these items: HSA Family ($50), Life Pst ($12.65), Loan ($85.00), Prtax Dntl ($31.98), Prtax Med ($319.65), Prtaxaflac ($43.98), and Vet ($25.00). Once more, we do not find the exhibit, or indeed the testimony, so conclusive that it would require our reversing the figure chosen by the Trial Court.

The final issue we address is whether the Trial Court erred in declining to make a retroactive recalculation of temporary alimony and child support. Husband states that "no retroactive calculation of either child or spousal support [was made] even though no spousal support was awarded in the final decree and, as pointed out above, the final child support figure (even without considering whether Father's income was correct) is less than one-fourth of the amount temporarily set." Husband cites to no law, nor are we aware of any, standing for the proposition that a trial court is *obliged* to retroactively recalculate child support or adjust temporary support because a lesser amount is awarded going forward. The Trial Court found specifically that Husband's income historically had been greater. As stated by the Trial Court in its November 2010 memorandum opinion:

> [T]he Court finds the income of Mr. Garner for child support and alimony purposes to be $55,000.00 per year. The Court finds this is his current income and historically [h]is income has been greater. Accordingly, the modification of child support and alimony will not be retroactive.

The evidence does not preponderate against this, nor any of the Trial Court's factual findings. We affirm the judgment of the Trial Court as modified.

## Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Robert Allen Garner, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-18-